# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued September 23, 2011　　　Decided November 8, 2011

No. 11-5047

SUSAN SEVEN-SKY, ALSO KNOWN AS SUSAN SEVENSKY, ET AL.,
APPELLANTS

v.

ERIC H. HOLDER, JR., ET AL.,
APPELLEES

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:10-cv-00950)

———

*Edward L. White III*, pro hac vice, argued the cause for appellants. With him on the briefs were *Jay Alan Sekulow*, *Colby M. May*, *Miles Landon Terry*, and *James M. Henderson Sr.*

*David B. Kopel* was on the brief for *amici curiae* Independence Institute in support of appellants.

*Dale L. Wilcox* and *Michael Bekesha* were on the brief for *amicus curiae* Judicial Watch, Inc. in support of appellants.

*Lawrence J. Joseph* was on the brief for *amici curiae*

American Physicians & Surgeons, Inc., et al. in support of appellants.

*Paul D. Clement*, *Erin E. Murphy*, *Louis F. Hubener*, Deputy Solicitor General, Office of the Attorney General for the State of Florida, *Bill Cobb*, Deputy Attorney General for Civil Litigation, Office of the Attorney General for the State of Texas, *Luther Strange*, Attorney General, Office of the Attorney General for the State of Alabama, *Gregory F. Zoeller*, Attorney General, Office of the Attorney General for the State of Indiana, *Derek Schmidt*, Attorney General, Office of the Attorney General for the State of Kansas, *William J. Schneider*, Attorney General, Office of the Attorney General for the State of Maine, *Bill Schuette*, Attorney General, Office of the Attorney General for the State of Michigan, *Jon Bruning*, Attorney General, Office of the Attorney General for the State of Nebraska, *Wayne Stenehjem*, Attorney General, Office of the Attorney General for the State of North Dakota, *Marty J. Jackley*, Attorney General, Office of the Attorney General for the State of South Dakota, *Michael DeWine*, Attorney General, Office of the Attorney General for the State of Ohio, *Thomas W. Corbett, Jr.*, Acting Attorney General, Office of the Attorney General for the Commonwealth of Pennsylvania, *Robert M. McKenna*, Attorney General, Office of the Attorney General for the State of Washington, and *J.B. Van Hollen*, Attorney General, Office of the Attorney General for the State of Wisconsin. *Katherine J. Spohn*, Special Counsel to the Attorney General, Office of the Attorney General for the State of Nebraska, entered an appearance.

*Robert A. Levy*, *Ilya Shapiro*, *Hans Bader*, *Steven J. Lechner*, *Timothy Sandefur*, *Charles J. Cooper*, *David H. Thompson*, *Geoffrey D. Talmon* and *Brian Koukoutchos* were on the brief for *amici curiae* Cato Institute, et al. in support of appellants.

*Patrick T. Gillen* was on the brief for *amicus curiae* CatholicVote.org.

*Grant M. Lally* and *Deborah N. Misir* were on the brief for *amicus curiae* Caesar Rodney Institute in support of appellants.

*Beth S. Brinkmann*, Deputy Assistant Attorney General, U.S. Department of Justice, argued the cause for appellees. With her on the briefs were *Tony West*, Assistant Attorney General, *Ronald C. Machen Jr.*, U.S. Attorney, and *Mark B. Stern*, *Alisa B. Klein*, *Samantha L. Chaifetz* and *Dina B. Mishra*, Attorneys. *R. Craig Lawrence*, Assistant U.S. Attorney, entered an appearance.

*Rochelle Bobroff* was on the brief for *amici curiae* American Association of People with Disabilities, et al. in support of appellees.

*Ian Millhiser* was on the brief for *amici curiae* American Nurses Association, et al. in support of appellees.

*Stacy Canan* and *Michael Schuster* were on the brief for *amicus curiae* AARP in support of appellees.

*Marcia D. Greenberger* and *Melissa Hart* were on the brief for *amici curiae* The National Women's Law Center, et al. in support of appellees.

*Jeffrey A. Lamken* and *Robert K. Kry* were on the brief for *amici curiae* Law Professors Barry Friedman, et al. in support of appellees.

*Martha Coakley*, Attorney General, Office of the Attorney General for the Commonwealth of Massachusetts, and *Carol Iancu*, Assistant Attorney General, were on the brief for *amicus*

*curiae* Commonwealth of Massachusetts in support of appellees.

*Andrew J. Pincus*, *Charles A. Rothfeld*, *Michael B. Kimberly* and *Paul W. Hughes* were on the brief for *amici curiae* Constitutional Law Professors in support of appellees.

*Elizabeth B. Wydra* was on the brief  for *amicus  curiae* Constitutional Accountability Center  in support of appellees.

*Patrick J. Szymanski*, *Judith A. Scott*, *Walter Kamiat*, *Mark Schneider*, and *Scott Kronland* were on the brief for *amici curiae* Service Employees International Union, et al. in support of appellees.

*Hadrian R. Katz* and *Matthew A. Eisenstein* were on the brief for *amici curiae* Economic Scholars in support of appellees.

*Catherine E. Stetson*, *Dominic F. Perella*, *Melinda Reid Hatton*, and *Jeffrey G. Micklos* were on the brief for *amici curiae* American Hospital Association, et al. in support of appellees.

*Douglas F. Gansler*, Attorney General, Office of the Attorney for the State of Maryland, *John B. Howard Jr.*, Deputy Attorney General, *Joshua N. Auerbach*, Assistant Attorney General, *Kamala D. Harris*, Attorney General, Office of the Attorney General for the State of California, *Travis LeBlanc*, Special Assistant Attorney General, *George C. Jepsen*, Attorney General, Office of the Attorney General for  the State of Connecticut, *Joseph R. Biden*, *III*, Attorney General, Office of the Attorney General for the State of Delaware, *Irvin B. Nathan*, Attorney General, Office of the Attorney General for the District of Columbia, *Todd S. Kim*, Solicitor General, *David M. Louie*, Attorney General, Office of the Attorney General for the State

of Hawaii, *Tom Miller*, Attorney General, Office of the Attorney General for the State of Iowa, *Eric T. Schneiderman*, Attorney General, Office of the Attorney General for the State of New York, *John R. Kroger*, Attorney General, Office of the Attorney General for the State of Oregon, and *William H*. Sorrell, Attorney General, Office of the Attorney General for the State of Vermont, were on the brief for *amici curiae* State of Maryland, et al. in support of appellees.

*Alan B. Morrison* was on the brief for *amici curiae* Mortimer Caplin & Sheldon Cohen in support of appellees.

*Robin S. Conrad*, *K. Lee Blalack II*, and *Brian Boyle* were on the brief for *amicus curiae* Chamber of Commerce of the United States of America in support of neither party.

Before: KAVANAUGH, *Circuit Judge*, and EDWARDS and SILBERMAN, *Senior Circuit Judges*.

Opinion for the Court filed by *Senior Circuit Judge* SILBERMAN, with whom *Senior Circuit Judge* EDWARDS concurs.

Concurring opinion filed by *Senior Circuit Judge* EDWARDS.

Opinion dissenting as to jurisdiction and not deciding the merits filed by *Circuit Judge* KAVANAUGH.

SILBERMAN, *Senior Circuit Judge*:  The district court rejected appellants' challenge to the Patient Protection and Affordable Care Act.  They appeal.  Despite questions raised as to our subject matter jurisdiction, we conclude we have jurisdiction, and we affirm the district court's conclusion that the Act is constitutional.

6

I.

Since so much has already been written by our sister circuits about the issues presented by this case–which will almost surely be decided by the Supreme Court–we shall be sparing in adding to the production of paper.

Suffice it to say that the Affordable Care Act sought to reform our nation's health insurance and health care delivery markets with the aims of improving access to those markets and reducing health care costs and uncompensated care. Other courts of appeals have described its provisions at length. *See Thomas More Law Ctr. v. Obama*, 651 F.3d 529, 534-35 (6th Cir. 2011); *Florida v. U.S. Dep't of Health and Human Servs.*, 648 F.3d 1235, 1249-62 (11th Cir. 2011).

This suit, like others, involves a challenge to the "minimum essential coverage provision," which requires all "applicable individual[s]" to purchase and maintain "minimum essential coverage"–*i.e.*, required essential health benefits in an insurance plan–for each month beginning in January 2014. This requirement is commonly called the "individual mandate." Any "taxpayer" who "fails to meet the requirement" must pay a "shared responsibility payment," labeled a "penalty," which will be calculated by using the lesser of either a percentage of the taxpayer's income or the national average premium for the lowest-level plan providing "minimum essential coverage."[1]

Congress made specific findings why, in its judgment, the

---

[1] 26 U.S.C. § 5000A(a) (individual mandate); *id.* § 5000A(b)-(c) (penalty provision).

individual mandate regulates commerce.[2] Congress determined that decisions about whether and when to purchase health insurance, and how to pay for health care services, are inherently economic. And Congress found that without the mandate, uninsured individuals, in the aggregate, would consume costly health care services and pass on those costs to other market participants. Without the mandate, in Congress's view, other reforms–namely prohibitions on denying health insurance coverage to individuals with pre-existing medical conditions (the "guaranteed issue requirement") or using an individual's medical history to justify higher insurance premiums (the "community rating requirement")–would increase average premiums, exacerbate adverse selection problems, and discourage individuals from obtaining coverage until they were sick.

Appellants, four United States citizens and federal taxpayers, seek declaratory and injunctive relief to prevent various U.S. Government officials and agencies from enforcing the minimum essential coverage provisions. They argue that the mandate exceeds Congress's authority under the Commerce Clause and substantially burdens appellants Susan Seven-Sky's and Charles Edward Lee's religious exercise, in violation of the Religious Freedom Restoration Act.[3]

The district court granted the Government's motion to dismiss. It upheld the minimum essential coverage provisions under the Commerce Clause and the Necessary and Proper Clause as a regulation of economic activity that substantially

---

[2]These findings are codified at 42 U.S.C. § 18091(a)(1)-(3) and discussed extensively in other opinions. *See Florida*, 648 F.3d at 1244-47.

[3]42 U.S.C. § 2000bb *et seq.*

affects the health insurance and health care markets and as an essential element of a broader regulatory scheme. *Mead v. Holder*, 766 F. Supp. 2d 16, 33-35 (D.D.C. 2011). It also rejected appellants' Religious Freedom Restoration Act claim.[4] *Id.* at 42-43.

Appellants filed a timely appeal. We affirm.

## II.

At the outset, we are obliged to consider whether we have jurisdiction over this case. It is argued by one amicus[5] that the Anti-Injunction Act–which states, with some exceptions, that "no suit for the purpose of restraining the assessment or collection of *any tax* shall be maintained in any court by any person"–restrains us from entertaining the merits of this suit.[6] Indeed, the Fourth Circuit has recently held as much. *See Liberty Univ., Inc. v. Geithner*, No. 10-2347, 2011 WL 3962915, at *1 (4th Cir. Sept. 8, 2011). According to our sister circuit, no suits to challenge the individual mandate or the penalty can be brought until the mandate comes into effect in 2014, plaintiffs fail to comply, the IRS imposes a penalty, and plaintiffs bring a refund action against the IRS. *See id.* at *4. Although both appellants and the Government–the parties to this case–insist we do have jurisdiction, we, of course, have an independent duty to

---

[4] We affirm the dismissal of appellants' Religious Freedom Restoration Act claim, because we agree with the district court's reasoning that appellants failed to allege facts showing that the mandate will substantially burden their religious exercise. *See Mead*, 766 F. Supp. 2d at 41-43.

[5] *See* Br. for Amici Curiae Mortimer Caplin & Sheldon Cohen in Supp. of Appellees and Affirmance.

[6] 26 U.S.C. § 7421(a) (emphasis added).

examine that question, *see Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 95 (1998), and we have previously recognized that the Anti-Injunction Act is a limitation on our subject-matter jurisdiction, *see Gardner v. United States*, 211 F.3d 1305, 1311 (D.C. Cir. 2000).

The jurisdictional issue brings two interrelated questions. First, whether the Anti-Injunction Act itself, by using the words "any tax," applies to the shared responsibility payment. Second–even if the Anti-Injunction Act does not apply with its own force–does the Affordable Care Act invoke it by stating that the shared responsibility payment is to be "assessed and collected in the same manner" as penalties that *are* subject to the Anti-Injunction Act.

The Anti-Injunction Act, a part of the Internal Revenue Code, only bars pre-enforcement challenges to the assessment and collection of *taxes*. As is well known, Congress, in passing the Affordable Care Act, pointedly rejected proposals to designate the shared responsibility payment as a "tax," instead labeling it a "penalty."[7] That Congress called numerous other provisions in the Act "taxes" indicates that its decision to use the word "penalty" here was deliberate.[8] And congressional findings never suggested that Congress's purpose was to raise revenue. The Government estimates the penalty would raise $4 billion, but congressional findings emphasize that the aim of the shared responsibility payment is to encourage everyone to

---

[7]26 U.S.C. § 5000A(b); H.R. 3962, § 501, 111th Cong. (2009); H.R. 3200, § 401, 111th Cong. (2009); S. 1796, § 1301, 111th Cong. (2009); *see also Liberty Univ.*, 2011 WL 3962915 at *24 (Davis, J., dissenting).

[8]*See Thomas More*, 651 F.3d 529, 551 (6th Cir. 2011) (Sutton, J., concurring) (surveying usage).

purchase insurance; the goal is universal coverage, not revenues from penalties.[9] Though the shared responsibility payment penalty is codified as part of the Internal Revenue Code, Congress prohibited the IRS from using traditional criminal enforcement or levying powers to collect the payment.[10] Covered persons have a legal obligation to purchase minimum coverage, but it is rather obvious that this provision's success depends, much more than a typical tax obligation, on voluntary compliance.

The key question, therefore, is whether Congress intended the term "any tax" in the Anti-Injunction Act to sweep beyond exactions that Congress designated as "taxes" elsewhere in the Internal Revenue Code. The Fourth Circuit is of the view that "any tax" includes any exaction collected by the IRS, even if Congress called it a "penalty." *Liberty Univ.*, 2011 WL 3962915 at *6. We disagree. Both the Anti-Injunction Act and the shared responsibility payment are part of the Internal Revenue Code. When Congress uses the same word–here, "tax"–in the same context, we presume Congress intends the same meaning throughout. *See Erlenbaugh v. United States*, 409 U.S. 239, 243-44 (1972). And when Congress wants a "tax" in one statute to include more than the exactions it labels taxes in other statutes, it says so. For instance, a "tax" under the Bankruptcy Code means anything that functions like a tax, not just anything Congress labeled a "tax," only because Congress directed that terms used in the Bankruptcy Code shall have special meanings. *United States v. Reorganized CF & I Fabricators of Utah, Inc.*, 518 U.S. 213, 219-20 (1996). By analogy, if Congress says that a sum owed at customs is not a penalty, that designation controls for purposes of a customs

---

[9] 42 U.S.C. § 18091(a)(2)(A), (C), & (I).

[10] 26 U.S.C. § 5000A(g)(2).

jurisdictional statute. *See Helwig v. United States*, 188 U.S. 605, 610, 613 (1903).

Nothing we have seen suggests that Congress intended for "any tax" in the Anti-Injunction Act to include exactions *unrelated to taxes* that Congress labeled "penalties."[11] The Anti-Injunction Act does not define the word "tax." But it does not indicate in any way that the term "tax" can be given a different meaning than in the rest of the Internal Revenue Code. The only Supreme Court case to consider the meaning of "any tax" dates to 1883, and suggested that a "tax" meant anything collected as a tax–even if collected erroneously or illegally–so long as "it was claimed by the proper public officers" to be a "tax." *Snyder v. Marks*, 109 U.S. 189, 192 (1883). Since the Government denies that the shared responsibility payment is a tax, *Snyder*, at least, suggests that we should credit the Government. *See Liberty Univ.*, 2011 WL 3962915 at *31 (Davis, J., dissenting).

Importantly, aside from the Fourth Circuit's recent decision, no court has ever held that "any tax" under the Anti-Injunction Act includes exactions that Congress deliberately called "penalties." *Bailey v. George*, 259 U.S. 16 (1922), and *Bailey v. Drexel Furniture Co. (Child Labor Tax Case)*, 259 U.S. 20 (1922), two cases upon which the Fourth Circuit relied heavily, are not to the contrary. In *Bailey v. George*, the Supreme Court held that the Anti-Injunction Act barred a pre-enforcement challenge to the Child Labor Tax, which Congress had expressly labeled a tax. 259 U.S. at 20. Then, in *Child Labor Tax Case*, a refund action, the Supreme Court held that the Child Labor Tax was so regulatory in function that it ceased to be a "tax" for constitutional purposes. 259 U.S. at 38. These cases stand for

---

[11]The Act also has no legislative history. *Bob Jones Univ. v. Simon*, 416 U.S. 725, 736 (1974).

the proposition that exactions that Congress intended to enact as taxes are "tax[es]" within the meaning of the Anti-Injunction Act, but may not be "taxes" for constitutional purposes.[12] *See Liberty Univ.*, 2011 WL 3962915 at *28 (Davis, J., dissenting). They do not address our issue, which raises a quite different question: whether an exaction that Congress intended as a "penalty" is *also* a "tax" within the meaning of the Anti-Injunction Act.

Other parts of the Internal Revenue Code reinforce our view that Congress did not intend for the Anti-Injunction Act to cover penalties unconnected to tax liability or enforcement. Taxes and penalties carry distinct meanings in the Code, and Congress has been deliberate when it wants certain penalties to be treated as taxes. *See Liberty Univ.*, 2011 WL 3962915 at *24 (Davis, J., dissenting). As we discuss further below, Congress expressly defined taxes to include penalties for nonpayment of taxes imposed under Chapter 68, subchapter A and "assessable penalties" imposed under Chapter 68, subchapter B.[13] Congress understandably treated Chapter 68 penalties as taxes, because, unlike the shared responsibility payment, they are imposed for impeding or otherwise failing to comply with tax payment and reporting obligations. *See Thomas More*, 651 F.3d at 540; *cf. Mobile Republican Assembly v. United States*, 353 F.3d 1357,

---

[12]Similarly, *Lipke v. Lederer*, 259 U.S. 557 (1922), merely held that the Anti-Injunction Act does not always apply even if Congress labels an exaction a "tax." There, Congress made clear, in the rest of a criminal statute, that it did not really intend the exaction to be a tax. *Id.* at 561-62. That is different from our situation, where Congress repeatedly expressed its intention that the shared responsibility payment was to be a "penalty."

[13]26 U.S.C. § 6665(a) (stating that "taxes" also refer to Chapter 68, subchapter A penalties); *id.* § 6671(a) (stating that "taxes" also refer to Chapter 68, subchapter B penalties).

1362 (11th Cir. 2003) (treating penalties imposed for violating conditions of non-profit organizations' tax-exempt status as "taxes" because those conditions determine whether the organization is liable for taxes).[14]

Granted, the Code also refers to "any tax (including any interest, additional amounts, additional tax, and assessable penalties)" imposed by Title 26 when describing the IRS's assessment authority. *See, e.g.*, 26 U.S.C. § 6201. The Fourth Circuit and the dissent reason that because the IRS is empowered to assess taxes (including assessable penalties), and because the Anti-Injunction Act bars any suit to restrain the assessment of taxes, anything codified in the Internal Revenue Code and assessed by the IRS is subject to the Anti-Injunction Act. *See Liberty Univ.*, 2011 WL 3962915 at *6, 11. We think that inference leaps too far. The term "assessable penalties" in the Code is generally used to refer to Chapter 68, subchapter B penalties (entitled "Assessable Penalties"), not any type of penalty. *See, e.g.*, *id.* § 4083(d)(3)(B); *id.* § 6671; *id.* § 6684; *id.* § 6688; *id.* § 6695. Nothing in this language suggests that penalties assessed by IRS but unrelated to taxes–as opposed to interest, additional amounts, additional tax, and assessable penalties commonly found in Chapter 68, subchapter B–would fall under this provision. And if this language truly transformed all penalties into taxes merely because they were codified in the Tax Code and assessed by the IRS, Congress's deliberate efforts to treat the shared responsibility payment as a penalty, not a tax,

---

[14]The Fourth Circuit has also held that all premiums due under the Coal Act–which is outside Chapter 68, subchapter B of the Code–are "taxes" for purposes of the Anti-Injunction Act, but it reached that conclusion only after assuming, without analysis, that the definition of a "tax" under the bankruptcy law is the same as the Anti-Injunction Act. *In re Leckie Smokeless Coal Co.*, 99 F.3d 573, 583 (4th Cir. 1996).

would be inexplicable.  *See Liberty Univ.*, 2011 WL 3962915 at
*32-33 (Davis, J., dissenting).

Our interpretation is also supported by judicial construction
of the Tax Injunction Act, a statute that uses similar language to
the Anti-Injunction Act to bar suits to restrain the assessment or
collection of *state* taxes.  *See* 28 U.S.C. § 1341 ("The district
courts shall not enjoin, suspend or restrain the assessment, levy
or collection of any tax under State law where a plain, speedy
and efficient remedy may be had in the courts of such State.");
*Enochs v. Williams Packing & Nav. Co.*, 370 U.S. 1, 6 (1962).
It is well established that Congress used the term "tax" in the
Tax Injunction Act to mean assessments made for the purpose
of raising revenues, not regulatory "penalties" intended to
encourage compliance with a law.[15]   That distinction is in
keeping with the aim of the Anti-Injunction Act and Tax
Injunction Act, *i.e.* to avoid federal judicial interference with tax
revenues upon which federal and state budgets depend.  *See
Nat'l Private Truck Council, Inc. v. Oklahoma Tax Comm'n*,
515 U.S. 582, 586 (1995); *Williams Packing*, 370 U.S. at 7.

\* \* \*

The nature of appellants' challenge also demonstrates why

---

[15]*Chamber of Commerce v. Edmonson*, 594 F.3d 742, 761-62
(10th Cir. 2010); *RTC Commercial Assets Trust 1995-NP3-1 v.
Phoenix Bond & Indem. Co.*, 169 F.3d 448, 457 (7th Cir. 1999); *Ben
Oehrleins and Sons and Daughter, Inc. v. Hennepin Cnty.*, 115 F.3d
1372, 1382-83 (8th Cir. 1997); *Travelers Ins. Co. v. Cuomo*, 14 F.3d
708, 713-14 (2d Cir. 1993) (overruled on other grounds).  Courts do
not defer to the labels states–as opposed to Congress–bestow on
exactions, because the meaning of a "tax" under the Tax Injunction
Act is a question of federal, not state, law.  *See Edmonson*, 594 F.3d
at 761.

the Anti-Injunction Act, by its own terms, does not apply to this suit. Appellants have brought suit for the purpose of enjoining a regulatory command, the individual mandate, that requires them to purchase health insurance from private companies, produces no revenues for the Government, and imposes obligations independent of the shared responsibility payment. They seek injunctive and declaratory relief to prevent anyone from being subject to the mandate, irrespective of whether they intend to comply with it, and irrespective of the means Congress chooses to implement it. The harms appellants allege–the cost of purchasing health insurance from private companies, and violation of their religious belief that insurance expresses skepticism in God's ability to provide–exist as a result of the mandate, not the penalty. True, appellants also say that they do not intend to comply with the mandate, and that the penalty would be a serious financial burden. But that harm affects only the limited class of individuals who fail to comply when the mandate goes into effect.

The individual mandate and the shared responsibility payment create different legal obligations, for different categories of people, at different times. The mandate–described as the "requirement to maintain minimum essential coverage" in the statute–imposes a legal obligation on "applicable individual[s]" to purchase and maintain minimum health care coverage from an insurance company for each month beginning January 2014.[16] Foreign citizens, illegal aliens, prisoners, and those who qualify for religious exemptions are not considered "applicable individual[s]."[17]

By contrast, the penalty provisions are not symmetrical with

---

[16]26 U.S.C. § 5000A(a).

[17]*Id.* § 5000A(d)(2)-(4).

the mandate. Although some who fail to comply with the individual mandate must pay a penalty (the "shared responsibility payment") to the IRS, others–taxpayers who cannot afford coverage, or who fall below the filing threshold, members of Indian tribes, and any applicable individual whom the Secretary of Health and Human Services deems to have suffered a hardship–do not.[18] Moreover the purchase of health insurance is not to be directed to the Government, as is true of taxes, but rather to private insurers; it is only the penalty that flows to the Government.

That appellants' suit centers on the mandate is critical. The Anti-Injunction Act only bars suits that seek to restrain the IRS's assessment and collection of taxes. It has never been applied to bar suits brought to enjoin regulatory requirements that bear no relation to tax revenues or enforcement. Indeed, we have held that the Act does not apply to an IRS regulation that does not, by its terms, pertain to the assessment or collection of taxes. *Foodservice and Lodging Inst., Inc. v. Regan*, 809 F.2d 842, 846 (D.C. Cir. 1987) (allowing challenge to enjoin an IRS regulation regarding employers' reporting of tips).

It has been suggested that *Bob Jones University v. Simon*, 416 U.S. 725 (1974), and *Alexander v. "Americans United" Inc.*, 416 U.S. 752 (1974), support the application of the Anti-Injunction Act to this case. Those cases involved constitutional challenges to IRS letter-rulings revoking nonprofit organizations' tax-exempt status. In *Bob Jones*, the petitioner challenged the constitutionality of an IRS letter-ruling withdrawing its tax-exempt status by arguing that the ruling's true motivation was "to regulate the admissions policies of

---

[18]*Id.* § 5000A(b), (e). Violators will only owe the penalty starting in April 2015, when it must be enclosed with their tax returns.

private universities," not "to protect the revenues." 416 U.S. at 739. Plaintiffs similarly challenged the constitutionality of eliminating tax-exempt status for organizations engaged in political lobbying in *"Americans United."* 416 U.S. at 755-57. In both cases, plaintiffs argued–superficially similar to our appellants–that the IRS's letter-rulings were really regulatory prohibitions, and that plaintiffs' object was not to restrain the assessment and collection of tax revenues, but to ensure that donors seeking tax deductions would continue to contribute to their organizations. *Id.* at 760-61; *Bob Jones*, 416 U.S. at 738.

The Supreme Court rejected these arguments in both cases. It began with the proposition–not at issue here–that plaintiffs cannot evade the Anti-Injunction Act merely by pleading constitutional claims. *"Americans United,"* 416 U.S. at 759-60; *Bob Jones*, 416 U.S. at 740-41. More importantly, it reasoned–and this is the crucial distinction to our case–that the Anti-Injunction Act applied because challenges to IRS letter-rulings revoking tax-exempt status are *inextricably linked* to the assessment and collection of taxes. *"Americans United,"* 416 U.S. at 760-61; *Bob Jones*, 416 U.S. at 738-40. Plaintiffs' arguments that their suits were for the purpose of ensuring contributions, not impeding tax revenues, were also defeated by plaintiffs' own pleadings, since the *only* injuries plaintiffs identified involved tax liability. *"Americans United,"* 416 U.S. at 761; *Bob Jones*, 416 U.S. at 738-39; *cf. Liberty Univ.*, 2011 WL 3962915 at *14 (describing similar pleadings by plaintiffs in that case). It does not follow from those cases that plaintiffs can never bring a pre-enforcement challenge to a discrete regulatory requirement that imposes obligations unrelated to tax revenues if Congress, in a separate provision, chooses to tax some of those who violate it.

To be sure, it has been held that suits that do not directly seek to restrain tax assessment or collection are nonetheless

barred if they are directed at the means by which the IRS achieves those ends. *Koin v. Coyle*, 402 F.2d 468, 469 (7th Cir. 1968). Accordingly, the Anti-Injunction Act bars suits to prevent the IRS from using evidence it had allegedly obtained illegally as the basis for a tax assessment, *id.*; suits to enjoin IRS agents from disclosing information in corporate tax returns to third parties as part of an audit investigation, *Kemlon Prods. and Dev. Co. v. United States*, 638 F.2d 1315, 1316, 1318, 1320 (5th Cir. 1981); suits to enjoin local officials from giving the IRS information about narcotics traffickers used by the IRS to make jeopardy assessments, *Lewis v. Sandler*, 498 F.2d 395, 398-99 (4th Cir. 1974), and suits to enjoin the IRS from using particular methodologies to calculate tax deficiencies, *Campbell v. Guetersloh*, 287 F.2d 878, 879, 880-81 (5th Cir. 1961). But those cases merely stand for the proposition that the Act bars suits that interfere with ancillary functions to tax collection. Mandating the purchase of health insurance is plainly not such a function.

\* \* \*

In short, we are not persuaded by the Fourth Circuit's reasoning. We think that the Anti-Injunction Act does not, by its terms, cover the shared responsibility payment under the term "any tax." Our dissenting colleague, however, raises another, more substantial, objection: That Congress affirmatively intended for the Anti-Injunction Act to apply to the shared responsibility payment, because the Affordable Care Act directs that the penalty be "assessed and collected in the same manner as an assessable penalty under subchapter B of chapter 68." 26 U.S.C. § 5000A(g)(1). Since penalties included in *that* subchapter are "taxes" for purpose of the Anti Injunction Act, the dissent maintains that the shared responsibility payment can only be "assessed and collected in the same manner" as those penalties if it, too, is insulated from pre-enforcement challenges.

The Government argues that "assessed and collected in the same manner" has a more limited meaning; it does not speak to the availability of pre-enforcement review. We agree. "As used in the Internal Revenue Code . . . the term assessment involves a recording of the amount the taxpayer owes the Government," and "is essentially a bookkeeping notation" that is "made by recording the liability of the taxpayer in the office of the Secretary." *Hibbs v. Winn*, 542 U.S. 88, 100 (2004) (internal quotation marks and citations omitted). The term "collection" refers to the IRS's "actual imposition of a tax against a plaintiff." *Cohen v. United States*, 650 F.3d 717, 726 (D.C. Cir. 2011) (en banc). It begins with notice that a taxpayer is liable for an unpaid amount and a demand that the taxpayer pay it. The IRS ordinarily receives that sum when the taxpayer submits payment through any accepted means. If the taxpayer continues to refuse to pay, the IRS can employ various collection methods, including liens and levies on the taxpayer's property.[19] These terms, in analogous contexts, have been held to exclude the *timing* of challenges. "Assessing and collecting" a penalty "in the same manner" as a tax, for instance, does not require the same statute of limitations to apply to each. *See, e.g.*, *Sage v. United States*, 908 F.2d 18, 23-25 (5th Cir. 1990).

The phrase "in the same manner," which modifies "assessment and collection," moreover, is used throughout the Code to refer to methodology and procedures. For instance, the "[m]ethod of adjustment" for an adjustment made to correct an error is to "assess[] and collect[], or refund[] or credit[], the amount thereof in the *same manner* as if it were a deficiency." 26 U.S.C. § 1314(b) (emphasis added). A qualified issuer of forest conservation bonds is liable for any tax refund amount not

---

[19]*See* 26 U.S.C. § 6303 (notice); *id.* § 6311 (means of payment); *id.* § 6321 (liens); *id.* § 6331 (levies).

used for forestry conservation purposes, and "[a]ny such amount shall be assessed and collected in the *same manner* as tax imposed by this chapter, except that subchapter B of chapter 63 (relating to deficiency procedures) shall not apply in respect of such assessment or collection." *Id.* § 54B(h)(3)(A) (emphasis added). And "[a]ny underpayment of tax by a partner by reason of failing to comply" with certain requirements "shall be assessed and collected in the *same manner* as if such underpayment were on account of a mathematical or clerical error." *Id.* § 6241(b) (emphasis added). These directions tell the IRS *how* to calculate and obtain certain sums, not *when* to do so. *See Thomas More*, 651 F.3d at 540.

There is more to weaken the dissent's linguistic analysis. Although the Affordable Care Act states that the shared responsibility payment is to be assessed and collected in the same manner as an assessable penalty under subchapter B, thus tracking the language of Chapter 68's sentence (assessable penalties "shall be assessed and collected in the same manner as taxes"), the Affordable Care Act omits the next sentence in Chapter 68. That sentence reads that "any reference in this title to 'tax' imposed by this title shall be deemed also to refer to the penalties and liabilities provided by [subchapter B]." 26 U.S.C. § 6671(a). The second sentence sweeps broader than the preceding sentence; it means subchapter B assessable penalties–which are all directly related to taxes–are to be treated as taxes for *all purposes* under the Code. That is why it has universally been held that the Anti-Injunction Act applies to various Chapter 68 assessable penalties.[20] Similarly, the Anti-Injunction Act applies to interest due on taxes because of

---

[20]*See Botta v. Scanlon*, 314 F.2d 392, 393 (2d Cir. 1963) (surveying cases); *see also Souther v. Mihlbachler*, 701 F.2d 131, 132 (10th Cir. 1983); *Kelly v. Lethert*, 362 F.2d 629, 633 (8th Cir. 1966); *Shaw v. United States*, 331 F.2d 493, 496 (9th Cir. 1964).

identical language in another section of the Code requiring that this interest be treated as a tax.[21]

If penalties were equivalent to taxes for all purposes–including the application of the Anti-Injunction Act–the last sentence of section 6671 would be superfluous. It is a hallowed maxim of statutory interpretation that we must give effect, if possible, to all words in a statute. *See Duncan v. Walker*, 533 U.S. 167, 174 (2001). We do not believe that Congress somehow inadvertently omitted the last sentence in 6671 when it drafted the cross-reference to Chapter 68 assessable penalties in the shared responsibility payment provision. Congress often indicates with specificity when it wants other exactions in the Code to be treated as taxes.[22] And when Congress states that an exaction should be "assessed and collected in the same manner as a tax," omits this last sentence, and still wishes to bar suits to restrain assessment or collection, it has included specific provisions to do just that.[23] Congress's deliberate decision not to do so here is telling.

---

[21]*See Nuttelman v. Vossberg*, 753 F.2d 712, 714 (8th Cir. 1985) (interpreting 26 U.S.C. § 6601(e)(1)); *Prof'l Eng'r, Inc. v. United States*, 527 F.2d 597, 599 (4th Cir. 1975) (similar).

[22]*See, e.g.*, 26 U.S.C. § 6601 (interest on tax treated as tax); *id.* § 6242(c)(3)(B) (payments of certain additional liabilities incurred by partnerships "treated as an underpayment of tax")*; id.* § 6665 (additions to the tax, additional amounts, and penalties under Chapter 68, subchapter A treated as tax).

[23]*See, e.g.*, 26 U.S.C. § 6305(a)-(b) (directing that the assessment and collection of Social Security-related liabilities should be "assess[ed] and collect[ed] . . . in the same manner . . . as if such amount were a tax," and adding additional provisions expressly barring "any action . . . brought to restrain or review the assessment and collection" of those liabilities).

In sum, we read the shared responsibility payment provision, section 5000A(g)(1), as not implicating the Anti-Injunction Act. If we had any doubt about our conclusion, we think our dissenting colleague's interpretation is further foreclosed by two additional considerations. First, Congress, as we have noted, made the mandate the Affordable Care Act imposes on covered persons to purchase insurance analytically and legally separate from the shared responsibility penalty. Second, since the Anti-Injunction Act's obvious purpose is to protect the Government's fisc, we think the Government's interpretation–that the Act is no bar to pre-enforcement judicial review–if not a waiver, is at least entitled to deference.

We think it quite unlikely that Congress intended to foreclose pre-enforcement judicial review of the *mandate* even if Congress intended to delay review of the penalty. The scope of the legal obligation imposed by the mandate is broader than the scope of the enforcement mechanism of the penalty. This divergence illustrates persuasively why the Anti-Injunction Act would be an awkward fit–and, therefore, quite unlikely to be what Congress intended. If the Act applied to the mandate, those subject to the mandate but exempt from the penalty would either have no judicial relief–because they could never bring a refund suit–or would be able to sue when others subject to the penalty could not.[24] *See South Carolina v. Regan*, 465 U.S. 367,

---

[24]Whether appellants or anyone else will fall under this category, as individuals exempted from the penalty because they cannot afford coverage, cannot be determined without knowing their *future* household income. *See* 26 U.S.C. § 5000A(e)(1)(A). By that point, of course, appellants may have lost the opportunity to bring a pre-enforcement challenge to the mandate irrespective of whether they are allowed to do so under the Anti-Injunction Act. Whether framed as an issue of ripeness or remedies, the outcome is the same: The applicability of the Anti-Injunction Act to challenges to the individual

378 (1984) (holding that the Anti-Injunction Act does not apply "to actions brought by aggrieved parties for whom [Congress] has not provided an alternative remedy."). To be sure, that raises a question whether someone subject to the mandate has standing to challenge the legality of the mandate if he or she does not face a penalty. But it is unnecessary to decide that question to conclude that Congress would be quite reluctant to endorse such a strange scheme for judicial review.

Secondly, the Government's determination that the Anti-Injunction Act should not be interpreted to bar appellants' suit is entitled to deference.[25] *Cf. Snyder*, 109 U.S. at 192. After all, the Government is the sole beneficiary of the Act, which facilitates the IRS's orderly and uninterrupted collection of taxes and protects IRS collectors from being subject to litigation before they complete these functions. *Bob Jones*, 416 U.S. at 736-37.

Past Supreme Court decisions emphasizing the breadth of the Government's authority to determine whether it will be

---

mandate cannot be conflated with challenges to the minimum essential coverage penalty.

[25]Earlier in this litigation, the Government argued that the Anti-Injunction Act barred this suit because the shared responsibility payment is a "tax" under the Act. *See Seven-Sky v. Holder*, No. 1:10-cv-00950 at 15-16 (D.D.C. Aug. 20, 2010) (memorandum of law in support of defendants' motion to dismiss). The Government has since abandoned that position. It now concludes that appellants' suit "poses no realistic threat of . . . disruption" to the "federal government's administration of the Tax Code," and that the cross-reference to Chapter 68 assessable penalties in 5000A(g)(1) should not be read as invoking the Anti-Injunction Act. Fed. Gov't Supplemental Br. at 3-5, 7, *Liberty Univ., Inc. v. Geithner*, No. 10-2347 (4th Cir. May 31, 2011).

subject to pre-enforcement suits underscore why the Government's position as to whether something is a "tax" under the Anti-Injunction Act deserves deference. In *Cheatham v. United States*, 92 U.S. 85 (1875), the Court explained the purpose of the Anti-Injunction Act by stating that "the government has the right to prescribe the conditions on which it will subject itself to the judgment of the courts in the collection of its revenue." *Id.* at 89. And in *Helvering v. Davis*, 301 U.S. 619 (1937), the Court held that the predecessor to the Anti-Injunction Act could be waived by the Government in litigation. *Id.* at 639. We acknowledge that *Helvering* may well be an anomaly predating more stringent jurisdictional limitations, and that the Government has disclaimed any explicit waiver of the Anti-Injunction Act in its recent filings before the Supreme Court. Still, the Court has recognized that pre-enforcement suits restraining the assessment or collection of taxes might not be barred if they are inconsistent with the Act's purposes. *See Williams Packing*, 370 U.S. at 7; *see also Bob Jones*, 416 U.S. at 740 (suggesting that if the IRS's interpretations were without legal basis or "unrelated to the protection of the revenues," the Act might not apply).

The Government's reading of section 5000A(g)(1), the shared responsibility payment provision, as not invoking the Anti-Injunction Act is entitled to weight. That provision, after all, delegates administration and enforcement powers to the IRS. Whether Congress meant to invoke the Anti-Injunction Act through the cross-reference in the penalty provision is a question that goes to the timing of the Government's enforcement powers. The Government has advanced a perfectly plausible reading of the statute (indeed, in our view, the better one), and therefore we accept it.

III.

Appellants' primary argument why the individual mandate exceeded Congress's enumerated powers is that Congress cannot *require* individuals with no connection to interstate commerce, and no desire to purchase a product, nonetheless to do so. Congress's authority to regulate commerce, they say, extends only to *existing* commerce, *i.e.* only to individuals who take affirmative acts that bring them into, or substantially affect, an interstate market, and only for the duration of those activities. For this reason, the mandate also cannot be justified under the Necessary and Proper Clause, because that clause can effectuate only those powers that Congress actually possesses under the Commerce Clause, not create new ones. To hold otherwise would remove any limitations on federal power, at the expense of state sovereignty. Congress, appellants warn, could force individuals to buy any product, in any market, with any penalty–from fines to criminal prosecution–for non-compliance.

The Government counters that the individual mandate is well within the bounds of congressional power. Congress can regulate even purely local, intrastate economic behavior so long as, in the aggregate, it substantially affects interstate commerce. The manner in which consumers pay for services in the interstate health care market is such an example. Because virtually everyone will, at some point, need health services, no one is truly inactive, and the health services market is inextricably intertwined with health insurance. Congress found that those who do not purchase health insurance, and instead self-insure, almost inevitably take health care services they cannot afford. Hospitals, by virtue of federal law and professional obligation, provide these services, and as a result, $43 billion in annual costs are shifted to the insured, through higher premiums. That, in turn, makes health insurance less affordable and increases the total number of uninsured. Therefore, it is argued that Congress rationally concluded that

decisions about how to pay for health care, in the aggregate, substantially affect interstate commerce. The Government contends, moreover, that the individual mandate can be upheld as an essential element of the Affordable Care Act's broader reforms, like the guaranteed issue and community rating requirements, which all agree are within Congress's power. That is because Congress found that absent the mandate, the guaranteed issue and community rating requirements would lead individuals to wait to buy insurance until they needed care, causing higher premiums, again reducing the number of insured, and destroying the efficacy of Congress's regulatory scheme.

The Government concedes the novelty of the mandate and the lack of any doctrinal limiting principles; indeed, at oral argument, the Government could not identify any mandate to purchase a product or service in interstate commerce that would be unconstitutional, at least under the Commerce Clause. But the Government does stress that the health care market is factually unique; there are few other markets, it says, where participation is a virtual certainty, or where declining to buy a product disproportionately causes a national economic problem.

## A.

As is apparent, appellants have brought a facial challenge to the individual mandate. Appellants recognize that a facial challenge theoretically must establish "that no set of circumstances exists under which the [law] would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987). But unlike the plaintiffs before the Sixth Circuit, appellants were careful to avoid conceding there were any valid applications of the law. *Cf. Thomas More*, 651 F.3d at 556, 561-62, 564 (Sutton, J., concurring). Instead, appellants' theory of the Commerce Clause would invalidate virtually all conceivable applications of the mandate.

Since, according to appellants, Congress only has the power to regulate individuals who are affirmatively acting in ways that affect a market, and for the duration of their activity, Congress also categorically lacks authority to compel individuals to *maintain* participation in a market into the future. No one currently active in the health insurance market will necessarily be active in 2014, when the mandate goes into effect, or remain active in that market in perpetuity, absent the mandate. Nor do appellants here concede that Congress could impose a mandate to require individuals to purchase insurance when they arrive at a hospital for treatment and maintain that insurance indefinitely. The requirement to maintain coverage into the future, under their theory, dooms the mandate in its entirety.

To be sure, some applications of the mandate might conceivably be constitutional even under appellants' theory–for instance, if the mandate were limited to compelling those individuals presently active in the health insurance market to purchase another month or year of coverage. But viewing those applications in isolation may be different from considering them in the context of a law that, under appellants' theory, *predominantly* consists of invalid applications that exceed Congress's authority. Though facial challenges are presumptively disfavored, the Supreme Court nonetheless invalidated the Gun-Free School Zones Act *in toto* in *United States v. Lopez*, 514 U.S. 549 (1995), even after suggesting there were circumstances in which the law might have been constitutionally applied (*e.g.* if the gun had, in fact, traveled in interstate commerce). *Id.* at 561-62, 567. Perhaps facial invalidation was justified because the Supreme Court assumed that in practice, *most* applications of the law would be unconstitutional, or because differentiating between constitutional and unconstitutional applications would be too

difficult.[26] But *Lopez* is silent on this point, as are subsequent cases. That cautions against assigning dispositive significance to the issue here, and we do not.

We think we are obliged to confront the gravamen of appellants' argument as to the scope of the Commerce Clause.

### B.

Appellants' central objection to the mandate is that Congress, for the first time, has actually commanded that all Americans purchase a product, health insurance, that many of them have never purchased before, never wish to purchase, and may never need. Appellants do not question that Congress can regulate the interstate health care and health insurance markets, or that Congress reasonably could conclude that decisions about whether to purchase health insurance substantially affect interstate commerce. The contested issue here is whether the Government can require an immensely broad group of people–all Americans, including uninsured persons with no involvement in the health insurance and health care markets–to buy health insurance now, based on the mere *likelihood* that most will, at some point, need health care, thus virtually inevitably enter that market, and consequently substantially affect the health insurance market. Appellants say that Congress cannot regulate based on such sweeping generalizations. Only individuals who are voluntarily engaging in an "activity" related to interstate commerce–not the uninsured, who are "inactive"–are within the scope of the Commerce Clause.

The mandate, it should be recognized, is indeed somewhat novel, but so too, for all its elegance, is appellants' argument.

---

[26]*See* Richard H. Fallon, Jr., *Fact and Fiction About Facial Challenges*, 99 Calif. L. Rev. 915, 945, 959 (2011).

No Supreme Court case has ever held or implied that Congress's Commerce Clause authority is limited to individuals who are presently engaging in an *activity* involving, or substantially affecting, interstate commerce.

We look first to the text of the Constitution. Article I, § 8, cl. 3, states: "The Congress shall have Power . . . To *regulate Commerce* with foreign Nations, *and among the several States,* and with the Indian Tribes." (emphasis added). At the time the Constitution was fashioned, to "regulate" meant, as it does now, "[t]o adjust by rule or method," as well as "[t]o *direct.*"[27] To "direct," in turn, included "[t]o prescribe certain measure[s]; to mark out a certain course," and "[t]o order; to command."[28] In other words, to "regulate" can mean to require action, and nothing in the definition appears to limit that power only to those already active in relation to an interstate market. Nor was the term "commerce" limited to only *existing* commerce. There is therefore no textual support for appellants' argument. So we turn to Supreme Court decisions.

The Framers, in using the term "commerce among the states," obviously intended to make a distinction between interstate and local commerce, but Supreme Court jurisprudence over the last century has largely eroded that distinction. *See Lopez*, 514 U.S. at 553-61; *id.* at 568-75 (Kennedy, J., concurring). Today, the only recognized limitations are that (1) Congress may not regulate non-*economic* behavior based solely on an attenuated link to interstate commerce, and (2) Congress

---

[27]Samuel Johnson, 2 *Dictionary of the English Language* 1619 (4th ed. 1773) (reprinted 1978) (emphasis added) (hereinafter Johnson); *see also* T. Sheridan, *A Complete Dictionary of the English Language* (2d ed.) (1789) (same).

[28]Johnson 514.

may not regulate intrastate economic behavior if its aggregate impact on interstate commerce is negligible.  *See United States v. Morrison*, 529 U.S. 598, 610, 615-19 (2000); *Lopez*, 514 U.S. at 558-61, 566-67.  Those limitations are quite inapposite to the constitutionality of the individual mandate, which certainly is focused on economic behavior–if only decisions whether or not to purchase health care insurance or to seek medical care–that does substantially affect interstate commerce.

To be sure, a number of the Supreme Court's Commerce Clause cases have used the word "activity" to describe behavior that was either regarded as within or without Congress's authority.[29]  But those cases did not purport to limit Congress to reach only *existing* activities.  They were merely identifying the relevant conduct in a descriptive way, because the facts of those cases did not raise the question–presented here–of whether "inactivity" can also be regulated.  *See Florida*, 648 F.3d at 1286.  In short, we do not believe these cases endorse the view that an existing activity is some kind of touchstone or a necessary precursor to Commerce Clause regulation.

We think the closest Supreme Court precedent to our case is *Wickard v. Filburn*, 317 U.S. 111 (1942).  There, a farmer ran afoul of his allowed wheat acreage under the Agricultural Adjustment Act of 1938 by growing additional wheat, not for sale, but to feed his family and his livestock.  *Id.* at 114-15, 118-19.  Filburn argued that the Act was unconstitutional as applied to him because he was not using the excess wheat for any activity in the interstate market.  The Supreme Court unanimously rejected this claim.  It held that even growing wheat for personal consumption, not for sale in any market, could affect the national price, and therefore was within

---

[29]*See, e.g.*, *Gonzales v. Raich*, 545 U.S. 1, 17, 26 (2005); *Morrison*, 529 U.S. at 610-13; *Lopez*, 514 U.S. at 558-61.

Congress's commerce power. *Id.* at 127-28. This conclusion was not only because his wheat might be diverted into the national market, as was recognized in *Gonzales v. Raich*, 545 U.S. 1, 18-19 (2005). Justice Jackson said even "if we assume that it is never marketed, it supplies a need of the man who grew it which would otherwise be reflected by purchases in the open market. Home-grown wheat in this sense competes with wheat in commerce. The *stimulation* of commerce is a use of the regulatory function quite as definitely as prohibitions or restrictions thereon." *Wickard*, 317 U.S. at 128 (emphasis added). Justice Jackson thus recognized that the Act "force[d] some farmers into the market to buy what they could provide for themselves." *Id.* at 129. Although a regulation limited the size of the farms covered, the logic of the opinion would apply to force any farmer, no matter how small, into buying wheat in the open market. *See Raich*, 545 U.S. at 20. *Wickard*, therefore, comes very close to authorizing a mandate similar to ours, at least indirectly, and the farmer's "activity" could be as incidental to the regulation as simply owning a farm.

Indeed, were "activities" of some sort to be required before the Commerce Clause could be invoked, it would be rather difficult to define such "activity." For instance, our drug and child pornography laws, criminalizing mere possession, have been upheld no matter how passive the possession, and even if the owner never actively distributes the contraband, on the theory that possession makes active trade more likely in the future.[30] And in our situation, as Judge Sutton has cogently demonstrated, many persons regulated by the mandate would presumably be legitimately regulated, even if activity was a precursor, once they sought medical care or health insurance.

---

[30]*See Raich*, 545 U.S. at 19; *United States v. Sullivan*, 451 F.3d 884, 891-92 (D.C. Cir. 2006); *United States v. Forrest*, 429 F.3d 73, 78-79 (4th Cir. 2005).

*Thomas More*, 651 F.3d at 560-61 (Sutton, J., concurring). The Supreme Court has repeatedly rejected these kinds of distinctions in the past–disavowing, for instance, distinctions between "indirect" and "direct" effects on interstate commerce–because they were similarly unworkable. *See Wickard*, 317 U.S. at 119-20; *see also Lopez*, 514 U.S. at 569-71 (Kennedy, J., concurring).

Appellants have sought to avoid this logic by asserting that even if one could be obliged to buy insurance when one sought medical care, one cannot be obliged to keep it. Although that argument, as we have noted, avoids the facial challenge objection, it strikes us as rather unpersuasive on the merits. Congress, which would, in our minds, clearly have the power to impose insurance purchase conditions on persons who appeared at a hospital for medical services–as rather useless as that would be–is merely imposing the mandate in reasonable anticipation of virtually inevitable future transactions in interstate commerce.

\* \* \*

Since appellants cannot find real support for their proposed rule in either the text of the Constitution or Supreme Court precedent, they emphasize both the novelty of the mandate and the lack of a limiting principle. The novelty–assuming *Wickard* doesn't encroach into that claim–is not irrelevant. The Supreme Court occasionally has treated a particular legislative device's lack of historical pedigree as evidence that the device may exceed Congress's constitutional bounds.[31] But appellants' proposed constitutional limitation is equally novel–one that only the Eleventh Circuit has recently–and only partially–endorsed.

---

[31]*See, e.g.*, *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 130 S. Ct. 3138, 3159 (2010); *Printz v. United States*, 521 U.S. 898, 905 (1997).

*Florida*, 648 F.3d at 1285-88. Moreover, the novelty cuts another way. We are obliged–and this might well be our most important consideration–to presume that acts of Congress are constitutional. *Morrison*, 529 U.S. at 607. Appellants have not made a clear showing to the contrary.

We acknowledge some discomfort with the Government's failure to advance any clear doctrinal principles limiting congressional mandates that any American purchase any product or service in interstate commerce. But to tell the truth, those limits are not apparent to us, either because the power to require the entry into commerce is symmetrical with the power to prohibit or condition commercial behavior, or because we have not yet perceived a qualitative limitation. That difficulty is troubling, but not fatal, not least because we are interpreting the scope of a long-established constitutional power, not recognizing a new constitutional right. *Cf. Caperton v. A.T. Massey Coal Co., Inc.*, 129 S. Ct. 2252, 2272 (2009) (Roberts, C.J., dissenting). It suffices for this case to recognize, as noted earlier, that the health insurance market is a rather unique one, both because virtually everyone will enter or affect it, and because the uninsured inflict a disproportionate harm on the rest of the market as a result of their later consumption of health care services.

Appellants's related argument is that upholding the mandate would turn the Commerce Clause into a federal police power, at the expense of state sovereignty. But the distinctions that separate national and local spheres have been understood as those between intrastate and interstate commerce, and between traditional, non-economic areas of state concern and those involving commerce. *Morrison*, 529 U.S. at 617-19. Appellants have not argued that health care and health insurance are uniquely state concerns, and decades of established federal legislation in these areas suggest the contrary. *See United States*

*v. South-Eastern Underwriters Ass'n*, 322 U.S. 533, 539 (1944); *Florida*, 648 F.3d at 1302-03. Nor do we think states' powers over health and general welfare make the health care *industry* a traditional state concern. Moreover, if Congress can regulate even instances of purely local conduct that were never intended for, or entered, an interstate market, we think Congress can also regulate instances of ostensible *inactivity* inside a state. The aggregate effect of that behavior, after all, is just as injurious to interstate commerce. Finally, appellants' position would not preserve state sovereignty. A state that requires all its citizens to purchase health insurance is making them "active" in the interstate market; if the state thereby cedes control over its health care policy to the federal government, its experimentation is tantamount to a relinquishment of its own power. *Thomas More*, 651 F.3d at 561-62 (Sutton, J., concurring); *cf. Veazie v. Moor*, 14 How. 568, 574 (1853).

\*   \*   \*

Appellants' view that an individual cannot be subject to Commerce Clause regulation absent voluntary, affirmative acts that enter him or her into, or affect, the interstate market expresses a concern for individual liberty that seems more redolent of Due Process Clause arguments. But it has no foundation in the Commerce Clause. The shift to the "substantial effects" doctrine in the early twentieth century recognized the reality that national economic problems are often the result of millions of individuals engaging in behavior that, in isolation, is seemingly unrelated to interstate commerce. *See Lopez*, 514 U.S. at 555-56. That accepted assumption undermines appellants' argument; its very premise is that the magnitude of any one individual's actions is irrelevant; the only thing that matters is whether the national problem Congress has identified is one that substantially affects interstate commerce. Indeed, in case after case, a version of appellants' argument–that

Congress's power to regulate national economic problems, even those resulting from the aggregated effects of intrastate activity, only extends to particular individuals if they have also affirmatively engaged in interstate commerce–has been rejected on that basis. *See United States v. Wrightwood Dairy Co.*, 315 U.S. 110, 121 (1942) (surveying cases). Whether any "particular person . . . is, or is not, also engaged in interstate commerce," the Supreme Court expressly held, is a mere "fortuitous circumstance" that has no bearing on Congress's power to regulate an *injury* to interstate commerce. *Id.*

*Wickard* is very much in that vein. In *Wickard*, it mattered not that Filburn's annual wheat output was trivial in relation to national production. Nor did it matter that Filburn was being penalized for behavior that had only the most tenuous impact on interstate commerce in of itself, since Filburn never intended the wheat to be used for commercial purposes, never sold it, and used it only to sustain his home farm. It was also irrelevant that the wheat quota could compel even those farmers with no intention of selling *any* wheat, in any market, to enter the interstate market. All that mattered were the overall dynamics of the wheat market–in other words, generalizations about *likely*, *future* economic behavior. If farmers like Filburn all exceeded their quotas, the mechanics of the wheat market made it inevitable that the interstate market would be impacted–either by the *likelihood* that the high price of wheat Congress was trying to maintain would induce some unspecified number of farmers to sell wheat at market after all, or the *probability* that farmers who had enough wheat for their own use would stop buying wheat at market. Either way, these economic forecasts–and not any affirmative acts by people like Filburn–were enough to sustain the law. 317 U.S. at 117, 126-28.

Cases since *Wickard* have minimized the significance of any particular individual's behavior yet further. They have

repeatedly confirmed that the actual impact of any one individual's conduct on interstate commerce is immaterial, so long as a rational basis exists for believing that a congressional enactment, as a whole, substantially relates to interstate commerce. *Raich*, 545 U.S. at 17-19; *Lopez*, 514 U.S. at 557. A single individual need not even be engaged in *any* economic activity–*i.e.* not participating in *any* local or interstate market–so long as the individual is engaged in some type of behavior that would undercut a broader economic regulation if left unregulated. *Raich*, 545 U.S. at 36 (Scalia, J., concurring). And a single individual need not even be engaging in the harmful activity that Congress deems responsible for a national economic problem; it is enough that in general, most do. Thus, when Congress finds that organized crime harms interstate commerce, and that most loan sharks are part of organized crime, Congress can regulate even those individual loan sharks who are *not* part of organized crime. *See Perez v. United States*, 402 U.S. 146, 147, 153-57 (1971). Similarly, it is irrelevant that an indeterminate number of healthy, uninsured persons will never consume health care, and will therefore never affect the interstate market. Broad regulation is an inherent feature of Congress's constitutional authority in this area; to regulate complex, nationwide economic problems is to necessarily deal in generalities. Congress reasonably determined that as a *class*, the uninsured create market failures; thus, the lack of harm attributable to any particular uninsured individual, like their lack of overt participation in a market, is of no consequence.

That a direct requirement for most Americans to purchase any product or service seems an intrusive exercise of legislative power surely explains why Congress has not used this authority before–but that seems to us a political judgment rather than a recognition of constitutional limitations. It certainly is an encroachment on individual liberty, but it is no more so than a command that restaurants or hotels are obliged to serve all

customers regardless of race, that gravely ill individuals cannot use a substance their doctors described as the only effective palliative for excruciating pain, or that a farmer cannot grow enough wheat to support his own family.[32] The right to be free from federal regulation is not absolute, and yields to the imperative that Congress be free to forge national solutions to national problems, no matter how local–or seemingly passive–their individual origins. *See Heart of Atlanta Motel, Inc. v. United States*, 379 U.S. 241, 258-59 (1964).

For the foregoing reasons, we affirm the decision of the district court.

*So ordered*.

---

[32]*Heart of Atlanta Motel, Inc. v. United States*, 379 U.S. 241, 258-59 (1964); *Raich*, 545 U.S. at 6-7; *Wickard*, 317 U.S. at 128; *see also Thomas More*, 651 F.3d at 557 (Sutton, J., concurring).

EDWARDS, *Senior Circuit Judge*, concurring: Congress's authority to legislate under the Commerce Clause is not without limits. If nothing else, there are boundaries that emanate from the Necessary and Proper Clause, *see* U.S. Const. art. I, § 8, cl. 18, which serve as principled limitations on Congress's authority under the Commerce Clause. As Justice Scalia explained in his concurrence in *Gonzales v. Raich*, 545 U.S. 1 (2005), Congress may regulate economic activities that have a substantial effect on interstate commerce and also enact laws to make a valid regulation of commerce effective. *See id.* at 37–39. With respect to the latter category, "[t]he relevant question is simply whether the means chosen are 'reasonably adapted' to the attainment of a legitimate end under the commerce power." *Id.* at 37 (citation omitted). "[T]he power to enact laws enabling effective regulation of interstate commerce can only be exercised in conjunction with congressional regulation of an interstate market, and it extends only to those measures necessary to make the interstate regulation effective." *Id.* at 38. Congress's power to make a regulation of the interstate market effective "is not a power that threatens to obliterate the line between 'what is truly national and what is truly local.'" *Id.* (citation omitted).

KAVANAUGH, *Circuit Judge*, dissenting as to jurisdiction and not deciding the merits:

The Affordable Care Act is unusually significant federal legislation that will affect all Americans. One provision of the Act requires most Americans to maintain health insurance or else pay a tax penalty when they file their annual tax returns. That provision – commonly referred to as the individual mandate – is codified in the Tax Code and takes effect in 2014. The tax penalty for those without health insurance is capped at the average price of a health insurance plan. The tax penalty is the only sanction for failing to have health insurance. And the IRS – and only the IRS – may assess, collect, and enforce the tax penalty.

Plaintiffs contend that Congress lacks constitutional authority to mandate that citizens purchase health insurance. The Government responds that Congress possesses the requisite authority under the Commerce and Necessary and Proper Clauses of Article I, Section 8 of the Constitution. The Government alternatively asserts that this provision creates nothing more than a routine tax incentive authorized by the Taxing Clause of Article I, Section 8.

For judges, there is a natural and understandable inclination to decide these weighty and historic constitutional questions. But in my respectful judgment, deciding the constitutional issues in this case at this time would contravene an important and long-standing federal statute, the Anti-Injunction Act, which carefully limits the jurisdiction of federal courts over tax-related matters.

Enacted in 1867, the Anti-Injunction Act, with a few exceptions, denies courts jurisdiction over pre-enforcement suits that would restrain "the assessment or collection of any tax." 26 U.S.C. § 7421(a). The Supreme Court has strictly interpreted that Act as a firm bulwark against premature

judicial interference with tax assessment and collection. As the Court has stressed time and again, although the Act may seem an inconvenient technicality in the context of a particular case, it is essential to the overall system of orderly and prompt federal tax administration.

Under the Anti-Injunction Act, a taxpayer seeking to challenge a tax law must first pay the disputed tax and then bring a refund suit, at which time the courts will consider the taxpayer's legal arguments. Or a taxpayer may raise legal arguments in defending against an IRS enforcement action. But a taxpayer may not bring a pre-enforcement suit. In this case, the individual mandate takes effect in 2014, so taxpayers without health insurance must start paying tax penalties on their tax returns in 2015. The Anti-Injunction Act means, therefore, that a suit challenging the individual mandate cannot be entertained until 2015, unless Congress acts before then to exempt these suits from the Act.

The Anti-Injunction Act applies here because plaintiffs' pre-enforcement suit, if successful, would prevent the IRS from assessing or collecting tax penalties from citizens who do not have health insurance. To be sure, the Affordable Care Act labels its exaction for failure to have health insurance as a tax "penalty" and not as a "tax." But the Anti-Injunction Act still applies. That's because the Affordable Care Act requires that the tax penalty for failure to maintain health insurance "be assessed and collected in the same manner as an assessable penalty under subchapter B of chapter 68" of the Tax Code. 26 U.S.C. § 5000A(g)(1). And penalties under subchapter B of chapter 68 in turn must "be assessed and collected in the same manner *as taxes*." 26 U.S.C. § 6671(a) (emphasis added). It follows from those two provisions, taken together, that these Affordable Care Act penalties must be assessed and collected "in the same manner as taxes."

Taxes are insulated from pre-enforcement suits by the Anti-Injunction Act. In order for the Affordable Care Act penalties to be assessed and collected "in the same manner as taxes," the assessment and collection of these Affordable Care Act penalties likewise must be insulated from pre-enforcement suits by the Anti-Injunction Act.

That straightforward chain of logic convincingly demonstrates that the Anti-Injunction Act poses a jurisdictional bar to our deciding this case at this time.

Moreover, there is an alternative and independent reason that the Anti-Injunction Act applies here. Section 6201 of the Tax Code defines the IRS's authority for assessment and collection of taxes to include assessment and collection of the civil penalties in the Tax Code that are assessed by the IRS – what are statutorily known as "additional amounts," "additions to the tax," and "assessable penalties." Section 6201 specifically requires the IRS to assess "all taxes (including interest, additional amounts, additions to the tax, and assessable penalties) imposed by this title." 26 U.S.C. § 6201(a); *see* 26 U.S.C. §§ 6301-6303 (collection). The Affordable Care Act imposes a civil "penalty" for failure to have health insurance; the penalty is to be "assessed" by the IRS; and it is to be assessed "in the same manner as an assessable penalty under subchapter B of chapter 68." The Affordable Care Act penalty is therefore an "assessable penalty" for purposes of Section 6201. Under Section 6201, it is also, then, a tax for purposes of the IRS's assessment authority. The Anti-Injunction Act in turn bars pre-enforcement suits to restrain assessment or collection of taxes. Because Section 6201 classifies the Affordable Care Act penalty as a tax for assessment and collection purposes, it follows that the Anti-Injunction Act bars pre-enforcement

suits to restrain the assessment or collection of the Affordable Care Act penalty.

That reasoning independently demonstrates that the Anti-Injunction Act precludes us from deciding this case at this time.

In sidestepping the Anti-Injunction Act, the majority opinion relies heavily on the fact that Congress used the word "penalty" rather than "tax" in the Affordable Care Act. But the majority opinion's surface appraisal fails to take account of the basic text and structure of the Tax Code. The Tax Code contains numerous penalties for violations of requirements set forth in the Code. Congress often uses the "penalty" label so as to have a greater coercive effect on behavior that Congress wants to encourage or discourage. But critical for present purposes (and overlooked by the majority opinion) is that the Tax Code equates tax penalties to taxes for numerous administrative purposes, including for assessment and collection by the IRS. Here, the text of the Tax Code establishes both that the Affordable Care Act penalty must be "assessed and collected in the same manner as taxes" (Section 6671) and that the Affordable Care Act penalty is a "tax" for purposes of the IRS's assessment power (Section 6201). By equating tax penalties to taxes for these purposes, each provision independently makes clear that these Affordable Care Act penalties, like taxes, are insulated from pre-enforcement suits by the Anti-Injunction Act.

The Tax Code is never a walk in the park. But the statutory analysis here leads to a firm conclusion that the Anti-Injunction Act bars this suit.

The fact that the Tax Code equates tax penalties to taxes for IRS assessment and collection purposes is known by Members of Congress who work on tax-related legislation –

in particular, the Members and staff of the Senate Finance Committee and the House Ways and Means Committee. Those Members and staff are likewise familiar with the Anti-Injunction Act. Those Tax Code specialists, and their counterparts in the Executive Branch, were deeply involved in crafting the Affordable Care Act. Over the years, Congress has carved out many exceptions to the Anti-Injunction Act to permit pre-enforcement challenges to tax laws, particularly in situations where delay would cause disruption or hardship. In this Act, moreover, Congress specifically relieved taxpayers from certain enforcement mechanisms that the IRS ordinarily may employ to enforce tax obligations. But Congress did not relieve taxpayers from the Anti-Injunction Act's bar against pre-enforcement suits. We must respect Congress's decision. Unless Congress creates an exception for these Affordable Care Act cases – which Congress could still do at any time – this suit cannot be decided by the federal courts until 2015.

Notwithstanding the text of the Anti-Injunction Act, some have argued that compelling prudential considerations demand that the courts decide this constitutional issue now. But prudential considerations cannot trump the text of a statute setting forth limits on a court's jurisdiction. In any event, in my judgment, the relevant prudential considerations favor our waiting until 2015.[1]

---

[1] In this court, no States are plaintiffs. We therefore need not consider whether the Anti-Injunction Act would apply differently to a State's challenges to the individual mandate. Regardless, States may not have standing to challenge the individual mandate, for reasons the Fourth Circuit explained. *See Virginia v. Sebelius*, 656 F.3d 253 (4th Cir. 2011).

6

I

The Affordable Care Act was passed by Congress and signed into law by President Obama on March 23, 2010. The Act initiated a series of major changes to the American health insurance and health care markets.

Although the following is an over-simplification, the Act's most important provisions are five: (1) an increase in federal spending, including through Medicaid, on health care for lower-income families and individuals; (2) the creation of state-run "exchanges" designed to help individuals without employer-provided or other health insurance obtain insurance more easily and cheaply than they can now on the open market; (3) a requirement that most employers provide health insurance to their employees or pay higher taxes than they otherwise would; (4) banning insurers from denying coverage or charging higher rates to individuals with pre-existing conditions or health problems; and (5) a mandate that most citizens maintain health insurance or else pay a tax penalty on their tax returns.

Plaintiffs take exception to that last element: the mandate that individuals maintain health insurance or else pay a tax penalty on their tax returns. Plaintiffs argue that Congress lacks authority to impose such a mandatory-purchase requirement under the Commerce Clause, the Necessary and Proper Clause, or the Taxing Clause, which are the constitutional bases cited by the Government to justify the mandate. Plaintiffs point out that a federal mandatory-purchase requirement is unprecedented in American history. Although some *States* have imposed similar mandates for their citizens to maintain health insurance or auto insurance, for example, plaintiffs explain that the *Federal Government*

does not possess a general police power over its citizens and has not previously employed such mandates.

A

The Tax Code is codified in Title 26 of the United States Code. (The terms "Tax Code," "Internal Revenue Code," and "Title 26" are synonymous.) Title 26 contains 11 subtitles, which in turn are subdivided into chapters numbered 1 through 100.

Within Title 26 is Subtitle D, which is entitled "Miscellaneous Excise Taxes." Within Subtitle D is chapter 48, which is entitled "Maintenance of Minimum Essential Coverage." Within chapter 48 is Section 5000A, which is entitled "Requirement to maintain minimum essential coverage" and contains the individual mandate provision at issue in this case.

Section 5000A provides in relevant part:

(a) **Requirement to maintain minimum essential coverage.** – An applicable individual shall for each month beginning after 2013 ensure that the individual, and any dependent of the individual who is an applicable individual, is covered under minimum essential coverage for such month.

(b) **Shared responsibility payment.** –
(1) **In general.** – If a taxpayer who is an applicable individual, or an applicable individual for whom the taxpayer is liable under paragraph (3), fails to meet the requirement of subsection (a) for 1 or more months, then, except as provided in subsection (e), there is hereby imposed on the taxpayer a penalty with respect to such failures in the amount determined under subsection (c).

> (2) **Inclusion with return.** – Any penalty imposed by this section with respect to any month shall be included with a taxpayer's return under chapter 1 for the taxable year which includes such month.

Section 5000A further provides that the amount of the tax penalty is capped at the average price of a health insurance plan. The section also specifies who is covered and who is exempt. For example, lower-income individuals and illegal aliens are not required to pay a penalty for failing to have health insurance.

Importantly, Section 5000A(g)(1) sets forth how the tax penalties will be assessed, collected, and paid:

> The penalty provided by this section shall be paid upon notice and demand by the Secretary, and except as provided in paragraph (2), shall be assessed and collected in the same manner as an assessable penalty under subchapter B of chapter 68.[2]

As explained more fully below, the cross-referenced provision – subchapter B of chapter 68 – in turn provides that tax penalties "shall be assessed and collected in the same manner *as taxes*." 26 U.S.C. § 6671(a) (emphasis added).

---

[2] Section 5000A(g)(1) refers to "paragraph (2)" of Section 5000A(g). Paragraph (2) precludes the IRS from using some of its more aggressive enforcement tools, such as levies, notices of liens, or criminal prosecution, when a citizen fails to have health insurance and fails to pay the required tax penalty. The IRS's primary enforcement tool under this statute for those who do not have health insurance and fail to pay the required penalty consists of offsets to tax refunds.

To promote compliance with the individual mandate, Congress did not enact criminal penalties enforceable by the Department of Justice.  Nor did Congress impose civil penalties enforceable through civil or administrative complaints brought by the Department of Justice or the Department of Health and Human Services, for example. Instead, Congress established a tax penalty that is codified in the Tax Code, paid on individual tax returns, and assessed, collected, and enforced by the IRS.[3]  And most importantly for present purposes, Congress employed cross-references making clear that the penalty must be "assessed and collected in the same manner as taxes."

By requiring that the Affordable Care Act penalties be assessed and collected in the same manner as taxes, Section 5000A(g)(1) triggers the threshold question before us:  Do we have jurisdiction to hear this pre-enforcement suit in light of the Anti-Injunction Act, which states that "no suit for the purpose of restraining the assessment or collection of any tax shall be maintained in any court"?

B

Enacted in 1867, the Anti-Injunction Act bars pre-enforcement challenges to tax laws, subject to certain statutory exceptions not relevant here.  The Act requires a taxpayer who objects to a tax law to first pay the tax and then assert his or her legal objections in a suit for refund.  *See* 26 U.S.C. §§ 7421(a), 7422.  Alternatively, a taxpayer may raise legal arguments in defense of non-payment during a

---

[3]  When I refer in this opinion to the Affordable Care Act penalties, I am referring only to the penalty in Section 5000A for failure to maintain health insurance.  This case does not call upon us to examine the various other taxes and penalties imposed by the wide-ranging Affordable Care Act.

deficiency or enforcement proceeding. But a taxpayer may not bring a pre-enforcement suit.

As legal challenges to the Affordable Care Act's individual mandate first popped up in district courts around the country, the Executive Branch initially took the position that the suits were all barred by the Anti-Injunction Act. Indeed, by my count, the Executive Branch told 10 separate district courts that the Anti-Injunction Act barred these cases. The Executive Branch argued that the courts could not decide the constitutionality of the Affordable Care Act's individual mandate until 2015 (in tax refund or enforcement suits after the mandate has taken effect).

The Executive Branch later changed its mind about the Anti-Injunction Act, however, presumably because of an understandable policy desire to have courts resolve the constitutional question about the individual mandate sooner rather than later.

That said, courts cannot avoid the Anti-Injunction Act. As the Supreme Court has long and repeatedly held, the Anti-Injunction Act is jurisdictional. Jurisdiction goes to a court's authority to decide a case, and courts must consider jurisdictional issues even when the defendant does not raise them. *See Arbaugh v. Y & H Corp.*, 546 U.S. 500, 506-07 (2006).[4]

---

[4] Both sides before us want this case decided now and contend that the Anti-Injunction Act does not bar this suit. The amicus brief of former IRS Commissioners Mortimer Caplin and Sheldon Cohen, submitted by able counsel Alan Morrison, cogently argued the opposite position. The Court is grateful to amici and counsel for their assistance.

Because the Anti-Injunction Act is jurisdictional, courts must apply the Act even when the Executive Branch affirmatively waives or does not assert it, and even when the parties jointly ask the courts to decide the relevant merits issues immediately. *See Enochs v. Williams Packing & Navigation Co.*, 370 U.S. 1, 5 (1962) ("The object of § 7421(a) is to withdraw jurisdiction from the state and federal courts to entertain suits seeking injunctions prohibiting the collection of federal taxes."); *id.* at 7 ("Otherwise, the District Court is without jurisdiction, and the complaint must be dismissed.").

The text of the Anti-Injunction Act manifests its jurisdictional status. The Act says that "no suit for the purpose of restraining the assessment or collection of any tax *shall be maintained in any court*." As the Supreme Court has explained, statutes like the Anti-Injunction Act that govern "a court's adjudicatory capacity" or that "speak to the power of the court rather than to the rights or obligations of the parties" are jurisdictional. *See Henderson ex rel. Henderson v. Shinseki*, 131 S. Ct. 1197, 1202 (2011); *Reed Elsevier, Inc. v. Muchnick*, 130 S. Ct. 1237, 1243 (2010) (citation and internal quotation marks omitted).[5]

Moreover, when "a long line of this Court's decisions left undisturbed by Congress has treated a similar requirement as jurisdictional, we will presume that Congress intended to follow that course." *Henderson*, 131 S. Ct. at 1203 (citation

---

[5] In recent years, the Court has carefully analyzed whether certain provisions governing a lawsuit's timing relate to claims processing rather than jurisdiction. *See, e.g.*, *Bowles v. Russell*, 551 U.S. 205 (2007); *Eberhart v. United States*, 546 U.S. 12 (2005); *Kontrick v. Ryan*, 540 U.S. 443 (2004). In so doing, the Court has reiterated that statutes like the Anti-Injunction Act that speak to the power of the court remain jurisdictional.

and internal quotation marks omitted). That interpretive principle certainly applies here: Since the Anti-Injunction Act's enactment in 1867, the Supreme Court has consistently ruled that the Act is jurisdictional. *See Jefferson County v. Acker*, 527 U.S. 423, 434 (1999) ("The federal statute Congress had in plain view was an 1867 measure depriving courts of jurisdiction over suits brought 'for the purpose of restraining the assessment or collection' of any federal tax."); *Bob Jones Univ. v. Simon*, 416 U.S. 725, 749-50 (1974) (affirming Fourth Circuit's holding that the District Court lacked jurisdiction under the Anti-Injunction Act); *Enochs v. Williams Packing*, 370 U.S. at 5 ("The object of § 7421(a) is to withdraw jurisdiction from the state and federal courts to entertain suits seeking injunctions prohibiting the collection of federal taxes."); *Dodge v. Osborn*, 240 U.S. 118, 119, 122 (1916) (affirming dismissal of suit to enjoin assessment and collection of taxes on jurisdictional grounds); *Brushaber v. Union Pacific Railroad Co.*, 240 U.S. 1, 10 (1916) (discussing inapplicability of the Anti-Injunction Act in order to "put out of the way a question of jurisdiction"); *see also Snyder v. Marks*, 109 U.S. 189, 194 (1883) (referring to the "government" and not the Executive Branch alone in saying that the Anti-Injunction Act was "enacted under the right belonging to the government to prescribe the conditions on which it would subject itself to the judgment of the courts in the collection of its revenues"); *Cheatham v. United States*, 92 U.S. 85, 88-89 (1876) (same).[6]

---

[6] This Court has also recognized the jurisdictional status of the Act. *See, e.g.*, *Gardner v. United States*, 211 F.3d 1305, 1311 (D.C. Cir. 2000) ("The District Court must dismiss for lack of subject matter jurisdiction any suit that does not fall within one of the exceptions to the Anti-Injunction Act."); *Nat'l Taxpayers Union, Inc. v. United States*, 68 F.3d 1428, 1435 (D.C. Cir. 1995)

What is more, the Executive Branch itself agrees that the Anti-Injunction Act is jurisdictional. It is true that the Executive Branch now argues that the Act does not bar suits involving the tax penalties at issue in this case. But the Executive Branch has not suggested that the Court can skip the Anti-Injunction Act question altogether and proceed directly to the Commerce and Taxing Clause issues. Indeed, the Executive Branch has expressly rejected that proposition and has recently reaffirmed its position that the Anti-Injunction Act is jurisdictional. *See* Reply Brief for United States at 2-3, *Dep't of Health & Human Services v. Florida*, No. 11-398 (U.S. Oct. 26, 2011).

The jurisdictional status of the Anti-Injunction Act reflects the Constitution's separation of powers in operation. Under the Constitution, Congress possesses the power to tax and spend, as well as the power of the purse over appropriations of money. Congress zealously guards those prerogatives. Here, Congress has not afforded discretion to the Executive Branch to waive or forfeit the Anti-Injunction Act's bar with respect to the assessment and collection of taxes. Rather, by making the Anti-Injunction Act jurisdictional, Congress has commanded courts to abide by the Act even when the Executive Branch might not assert it.

---

(same). Indeed, *every* court of appeals has found the Act jurisdictional.

The Supreme Court has consistently held that the related State Tax Injunction Act, 28 U.S.C. § 1341, is likewise jurisdictional. *See Levin v. Commerce Energy, Inc.*, 130 S. Ct. 2323, 2335 n.10 (2010) ("This Court and others have continued to regard the Act as jurisdictional."); *Hibbs v. Winn*, 542 U.S. 88, 107 (2004) (TIA is a "jurisdictional bar"); *Arkansas v. Farm Credit Services of Central Arkansas*, 520 U.S. 821, 823 (1997) (same); *California v. Grace Brethren Church*, 457 U.S. 393, 396 (1982) (TIA "deprived the District Court of jurisdiction to hear these challenges").

Congress has thereby ensured that the flow of revenue is not interrupted by litigation.

Therefore, even when the Executive Branch does not assert or affirmatively tries to waive the Anti-Injunction Act, we cannot overlook it. To do otherwise would contravene the basic separation of powers tenets that underlie jurisdictional principles. When Congress has established a jurisdictional limit on the courts' power, especially in cases involving monies due to the Federal Government, it would be inconsistent with our constitutional structure for a court to grant the Executive Branch authority to waive or forfeit that jurisdictional limitation.

In a drive-by attempt to crack the solid wall of precedent holding that the Anti-Injunction Act is jurisdictional, some have cited *Helvering v. Davis*, 301 U.S. 619, 639-40 (1937). But that case involved a suit by a shareholder against a private corporation, not against the Government. The case shows simply that the Anti-Injunction Act does not necessarily apply in private litigation between a corporation and its shareholders. *See* Brief for United States at 29 n.18, *Alexander v. "Americans United" Inc.*, 416 U.S. 752 (1974) (No. 72-1371) (similarly describing *Helvering v. Davis*).[7] That scenario obviously does not encompass this case. In any event, even if this jurisdictional bar were relaxed when the Executive Branch affirmatively waived the Act, the Executive Branch has recently reiterated to the Supreme Court that it has not asserted, and will not assert, any *Helvering v. Davis*-based waiver in these cases. *See* Reply Brief for United States at 6,

---

[7] On other occasions prior to *Helvering v. Davis*, the Court likewise held that the Anti-Injunction Act did not pose a jurisdictional bar to private litigation between a shareholder and a corporation. *See Brushaber*, 240 U.S. at 10; *Pollock v. Farmers' Loan & Trust Co.*, 157 U.S. 429, 554 (1895).

*Dep't of Health & Human Services v. Florida*, No. 11-398. As revealed by the many Supreme Court cases before and since that have described the Anti-Injunction Act as jurisdictional, the Court's 1937 *Helvering v. Davis* decision did not undermine the jurisdictional status of the Act.

The majority opinion nominally acknowledges that we must address the Anti-Injunction Act but says we should defer to the Executive Branch's analysis of why the Act does not apply. The majority opinion cites no relevant authority suggesting that courts should defer to the Executive Branch's interpretation of jurisdictional statutes such as the Anti-Injunction Act. *Not even the Executive Branch has argued that it should receive such deference.* The majority opinion's approach appears to be nothing more than a roundabout way of saying that courts can essentially pass over the Anti-Injunction Act when the Executive Branch claims the Act does not bar a suit. That approach is functionally equivalent to saying that the Act is not jurisdictional. But that's incorrect. We must independently analyze the Act, and we cannot just defer to the Executive's interpretation of it.

In sum, the Anti-Injunction Act is jurisdictional. The text of the Act speaks to the power of the courts, which means it is jurisdictional. And the Supreme Court has repeatedly held that the Act is jurisdictional. We therefore must address the Anti-Injunction Act.[8]

---

[8] The Supreme Court has held that the Anti-Injunction Act does not apply in cases where the Government's argument in support of the tax is frivolous. *See Enochs v. Williams Packing*, 370 U.S. at 7; *Bob Jones*, 416 U.S. at 745. The Supreme Court has also made clear that the Anti-Injunction Act applies to pre-enforcement suits only where there is an adequate alternative remedy, such as a refund suit. *See South Carolina v. Regan*, 465

16

II

A

To determine whether the Anti-Injunction Act bars this suit at this time, we start with the text of the Act:

> Except as provided in sections 6015(e), 6212(a) and (c), 6213(a), 6225(b), 6246(b), 6330(e)(1), 6331(i), 6672(c), 6694(c), and 7426(a) and (b)(1), 7429(b), and 7436, **no suit for the purpose of restraining the assessment or collection of any tax shall be maintained in any court by any person**, whether or not such person is the person against whom such tax was assessed.

26 U.S.C. § 7421(a) (emphasis added). The Supreme Court has repeatedly held that the Act bars pre-enforcement challenges to tax laws. The Court has interpreted "the principal purpose of this language to be the protection of the Government's need to assess and collect taxes as expeditiously as possible with a minimum of pre-enforcement judicial interference, and to require that the legal right to the

---

U.S. 367, 381 (1984). Here, the Government's position on the constitutional issue is obviously not frivolous, and a tax refund or enforcement suit is available to litigate the constitutional claims. Plaintiffs do not mount any meaningful contention otherwise.

I bring that point up now because some have suggested that the existence of those "exceptions" to the Anti-Injunction Act undermines the conclusion that it is jurisdictional. That suggestion reflects a misunderstanding of the concept of jurisdiction. Courts must consider a jurisdictional statute even when not raised. But the status of a statute as jurisdictional does not disable the courts from interpreting the statute and Congress's intent by means of the usual tools of statutory construction. *See, e.g.*, *id.* ("the Act was intended to apply only when Congress has provided an alternative avenue for an aggrieved party to litigate its claims on its own behalf").

disputed sums be determined in a suit for refund." *Bob Jones Univ. v. Simon*, 416 U.S. 725, 736 (1974) (internal quotation marks omitted).[9] By preventing pre-enforcement suits, the Act assures the United States of "prompt collection of its lawful revenue." *Enochs v. Williams Packing & Navigation Co.*, 370 U.S. 1, 7 (1962). A "collateral objective" of the Act, the Court has said, is "protection of the collector from litigation pending a suit for refund." *Bob Jones*, 416 U.S. at 737 (citation and internal quotation marks omitted).[10]

Of course, the exaction in this particular case is statutorily labeled as a Tax Code "penalty," not a "tax." Does the Anti-Injunction Act still apply? Yes, as we learn from a straightforward reading of the cross-references in the relevant statutory provisions. (I caution the reader that some of the following is not for the faint of heart.)

The majority opinion places heavy rhetorical reliance on the fact that Congress labeled the individual mandate provision as a "penalty" and not a "tax." That is a red herring. Congress often chooses the label "penalty" instead of "tax" because the "penalty" label suggests violation of a legal rule and thus has a more powerful effect in altering

---

[9] As an alternative to the refund suit, a resistant taxpayer who does not pay a required tax or penalty may face an IRS enforcement action seeking to collect the unpaid taxes or penalties. In those proceedings, the taxpayer generally may raise constitutional or statutory arguments as defenses to the underlying payment obligation.

[10] Federal law not only bars pre-enforcement suits to enjoin the assessment or collection of taxes, but also bars pre-enforcement suits seeking declaratory judgments "with respect to Federal taxes." 28 U.S.C. § 2201(a). In *Bob Jones*, the Supreme Court held that "the federal tax exception to the Declaratory Judgment Act is at least as broad as the Anti-Injunction Act." 416 U.S. at 733 n.7.

underlying behavior that Congress wants to encourage or discourage.[11] Congress thus has created numerous Tax Code civil penalties that apply when a taxpayer fails to comply with legal requirements set forth in the Code. *See, e.g.*, 26 U.S.C. § 527(j)(1) (penalty for failure of political organization to make required disclosures); 26 U.S.C. § 6672 (penalty for willful failure to meet requirement to collect, truthfully account for, and pay over tax); 26 U.S.C. § 6723 (penalty for failure to make timely report of information).

At the same time, the Tax Code is loaded with provisions that treat those Tax Code penalties as taxes for various administrative purposes, *including for assessment, collection, and payment*. *See, e.g.*, 26 U.S.C. §§ 6665(a), 6671(a).[12] The majority opinion's fixation on the "penalty" label causes it to neglect the basic text and structure of the Tax Code. The question here cannot be resolved without examining whether this is one of the places in the Tax Code that requires tax

---

[11] *See, e.g.*, OFFICE OF TAX POLICY, DEP'T OF THE TREASURY, REPORT TO THE CONGRESS ON PENALTY AND INTEREST PROVISIONS OF THE INTERNAL REVENUE CODE 36 (1999) ("[P]enalties clearly signal that noncompliance is not acceptable behavior. . . . In establishing social norms and expectations, subjecting the noncompliant behavior to any penalty may be as important as the exact level of the penalty . . . ."); EXEC. TASK FORCE FOR THE COMMISSIONER'S PENALTY STUDY, REPORT ON CIVIL TAX PENALTIES at II-4 (1989) (penalty is adverse consequence for failure to comply with a rule); *id.* at III-1 ("Penalties as a consequence of violating a standard of behavior remind taxpayers of their duty."); *id.* at X-1 ("Penalties are a tool for change.").

[12] Professor Bittker stated: "Virtually all civil penalties are assessed, collected, and subject to statutes of limitations in the same manner as taxes." BORIS I. BITTKER ET AL., FEDERAL INCOME TAXATION OF INDIVIDUALS ¶ 50.03 (3d ed. 2002). Assessment is the actual recording of the tax by the IRS. *See* 26 U.S.C. § 6203.

"penalties" to be treated as "taxes." Contrary to the suggestion in the majority opinion, the fact that the exaction here is labeled as a "penalty" only begins the Anti-Injunction Act analysis; it does not end it.

To begin, all agree that the Anti-Injunction Act would bar this suit if the individual mandate provision of the Affordable Care Act were either (i) labeled as a "tax" or (ii) labeled as a "penalty" but codified in chapter 68 subchapter B of the Tax Code. Subchapter B of chapter 68 is entitled "Assessable Penalties." Section 6671 provides that chapter 68 subchapter B penalties are to be "assessed and collected in the same manner as taxes."

The analytical question in this case arises because the exaction associated with the individual mandate of the Affordable Care Act is labeled as a "penalty" but is codified not in chapter 68 of the Tax Code, but rather in chapter 48 of Subtitle D, which is entitled "Miscellaneous Excise Taxes."[13]

---

[13] It appears that Congress was of two minds about whether this exaction should be called an "excise tax" and placed in chapter 48 of Subtitle D, which is entitled "Miscellaneous Excise Taxes," or called a penalty and placed in chapter 68 subchapter B, which is entitled "Assessable Penalties." *See* STAFF OF JOINT COMMITTEE ON TAXATION, JCX-27-10, ERRATA FOR JCX-18-10, at 2 (2010) (the Section 5000A "penalty is an excise tax"). Congress ended up placing it in chapter 48 of Subtitle D but calling it a penalty, cross-referencing chapter 68 subchapter B, and providing that the penalty must be assessed and collected by the IRS in the same manner as taxes. That untidiness might have been cleaned up had there been a House-Senate conference on this legislation. Some extraordinary electoral circumstances short-circuited that process. But it is telling, in any event, that *both* (i) excise taxes in chapter 48 of Subtitle D and (ii) assessable penalties in chapter 68 subchapter B are conceded by all parties to be subject to the Anti-Injunction Act. It would be quite odd – structurally speaking – to conclude that

For that reason, some have been misled into assuming that the Anti-Injunction Act does not apply to the Affordable Care Act's penalty for failure to have health insurance. That is a mistake, however, because the Affordable Care Act's individual mandate provision cross-references chapter 68. In particular, Section 5000A provides that the Affordable Care Act's penalties for failing to have health insurance must be assessed and collected in the same manner as chapter 68 subchapter B penalties. Those chapter 68 subchapter B penalties in turn must be assessed and collected in the same manner as taxes.

The relevant language of the Affordable Care Act states:

> **The penalty provided by this section** shall be paid upon notice and demand by the Secretary, and except as provided in paragraph (2), **shall be assessed and collected in the same manner as an assessable penalty under subchapter B of chapter 68.**

26 U.S.C. § 5000A(g)(1) (emphasis added). The cross-referenced provision – chapter 68 subchapter B – in turn states in relevant part:

> **The penalties and liabilities provided by this subchapter** shall be paid upon notice and demand by the Secretary, and **shall be assessed and collected in the same manner as taxes**. Except as otherwise provided, any reference in this title to "tax" imposed by this title shall be deemed also to refer to the penalties and liabilities provided by this subchapter.

26 U.S.C. § 6671(a) (emphasis added).

---

because the individual mandate provision is a mix of both, suddenly the Anti-Injunction Act does *not* apply.

When we put those two sections together, we see that these Affordable Care Act penalties must be assessed and collected in the same manner as taxes. To be sure, Congress carefully avoided the dreaded T-word ("tax") in the Affordable Care Act's mandate provision itself, Section 5000A. Instead, Section 5000A cross-references chapter 68 subchapter B, which in turn says assessable penalties "shall be assessed and collected in the same manner as taxes." 26 U.S.C. § 6671(a).

But as we learn in logic class, when A=B and B=C, then A=C. So it is here: The Affordable Care Act requires that its penalty "be assessed and collected in the same manner as an assessable penalty under subchapter B of chapter 68," and chapter 68 subchapter B penalties in turn must be "assessed and collected in the same manner as taxes." It follows that these Affordable Care Act penalties must be assessed and collected in the same manner as taxes.

Turning back, then, to the Anti-Injunction Act: That Act refers specifically to "the assessment or collection of any tax," and it requires that taxes be assessed and collected *without* pre-enforcement judicial interference. It follows that these Affordable Care Act penalties – which, as we have determined, must be "assessed and collected in the same manner as taxes" – likewise must be assessed and collected without pre-enforcement judicial interference. Otherwise, one could not say that the Affordable Care Act penalties were being assessed and collected in the same manner as taxes, as the statute requires.

To conclude that the Anti-Injunction Act does *not* apply here, one would have to say that a tax that may be challenged in pre-enforcement suits is "assessed and collected in the same manner" as a tax that is insulated from pre-enforcement

suits. Such an argument is implausible and untenable, for three main reasons.

*First*, when the Anti-Injunction Act applies, it bars pre-enforcement suits – that is, taxpayer suits before the tax is assessed and collected. In those situations, the tax is typically collected by the IRS when the taxpayer submits his or her tax return, *see* 26 U.S.C. §§ 6151, 6201, 6202, 6302, and thus *before* the taxpayer brings a lawsuit challenging the tax and seeking a refund. If the Anti-Injunction Act did not apply, however, the taxpayer could sue to block assessment and collection of the tax and refuse to pay the tax on his or her tax return. The taxpayer in that latter circumstance would generally pay any tax only *after* the litigation concluded. So as a temporal and practical matter, a tax is typically assessed and collected by the IRS much earlier – namely, before any lawsuit – when the Anti-Injunction Act applies. Two taxes are not assessed and collected in the same manner when they are assessed and collected years apart, and when one is assessed and collected by the IRS *before any litigation*, whereas the other is assessed and collected by the IRS only *after the completion of litigation*.

After all, the timing of tax assessment and collection is critical to tax collection generally, *see, e.g.*, 26 U.S.C. § 6151, and to the Anti-Injunction Act in particular. Two of the main statutory duties imposed on taxpayers are to file a tax return on time and to pay the tax liability on time. The whole theory of the Anti-Injunction Act rests on the fact that there is a significant difference for purposes of the Government's tax assessment and collection efforts between a tax assessed and collected in Year 1 and a tax assessed and collected in Year 2, for example. *See Bob Jones*, 416 U.S. at 747 ("powerful" government interest in "protecting the administration of the tax system from premature judicial interference"). That

explains why the Supreme Court has described the objective of the Act as ensuring "prompt collection" of revenue, not merely eventual collection of revenue. *Enochs v. Williams Packing*, 370 U.S. at 7. So it would be rather odd to turn around here and say that temporal differences are irrelevant and that two taxes assessed and collected years apart are in fact "assessed and collected in the same manner."

*Second*, the difference is not just the timing of assessment and collection, but also the means of assessment and collection. When the Anti-Injunction Act applies, a tax will generally be assessed and collected by the IRS with submission of the taxpayer's tax return. *See* 26 U.S.C. §§ 6151, 6201, 6301, 6302. By contrast, if the Anti-Injunction Act did not apply, a tax could be assessed and collected only after the litigation was resolved in favor of the IRS (if it was resolved in favor of the IRS), by means of a payment to the IRS in the wake of the court order. A tax assessed and collected by the IRS with a taxpayer's tax return and a tax assessed and collected by the IRS not with the tax return but rather following a court order cannot persuasively be characterized, in my judgment, as being "assessed and collected in the same manner."

In that regard, keep in mind that the individual tax return is absolutely central to the IRS's assessment and collection of taxes. Tax returns are the means by which most taxpayers self-assess and pay their taxes, and the means by which much of the Government's tax revenue is collected.[14] The tax

---

[14] The Supreme Court has recognized that point many times. *See Hibbs v. Winn*, 542 U.S. 88, 101 n.3 (2004) ("Income taxes, by contrast, are typically self-assessed in the United States. As anyone who has filed a tax return is unlikely to forget, the taxpayer, not the taxing authority, is the first party to make the relevant calculation of income taxes owed."); *United States v. Galletti*, 541 U.S. 114, 122

return thus forms the foundation of the IRS's assessment and collection process. A method of tax assessment and collection in which the IRS cannot rely on the individual tax return to assess and collect a tax but instead must engage in litigation to win the right to assess and collect a tax is a significantly different manner of assessment and collection – particularly when conceivably multiplied millions of times over for each affected individual tax return. Taxes assessed and collected through these two widely divergent methods cannot reasonably be said to be "assessed and collected in the same manner." *See United States v. American Friends Service Committee*, 419 U.S. 7, 10 (1974) (referring to withholding as method of collection and saying that Anti-Injunction Act applies even when only one method of collection of taxes would be restrained by a suit).[15]

---

(2004) ("The Federal tax system is basically one of self-assessment, whereby each taxpayer computes the tax due and then files the appropriate form of return along with the requisite payment. In most cases, the Secretary accepts the self-assessment and simply records the liability of the taxpayer.") (internal quotation marks and citation omitted); *Commissioner v. Lane-Wells Co.*, 321 U.S. 219, 223 (1944) ("The purpose is not alone to get tax information in some form but also to get it with such uniformity, completeness, and arrangement that the physical task of handling and verifying returns may be readily accomplished."); *see also* BITTKER ET AL., FEDERAL INCOME TAXATION OF INDIVIDUALS ¶ 44.01 ("The importance of the tax return as the basic document on which the self-assessment system rests is attested by the number of statutory provisions requiring returns to be filed; specifying their filing dates; attaching legal consequences to the fact of filing, the date of filing, and the information included; and imposing penalties for filing negligent or fraudulent returns and for failing to file.").

[15] The Affordable Care Act prohibits the IRS from using some of its traditional enforcement tools to enforce payment of the tax penalties. The majority opinion suggests that the IRS's ability to

25

*Third*, when the Anti-Injunction Act applies, the tax will be collected by the IRS and will be repaid to the taxpayer only if the taxpayer succeeds in the subsequent refund lawsuit. However, if the Anti-Injunction Act did not apply and the taxpayer succeeded in the pre-enforcement lawsuit, the tax would *never* be collected by the IRS *at all*. I find it quite difficult to say that a tax that is assessed and collected by the IRS but then returned to the taxpayer some years later is "assessed and collected in the same manner" as a tax that is never assessed or collected by the IRS at all. Common sense tells us that those two scenarios are not equivalent in terms of their manner of assessment and collection.

---

use only a subset of its traditional tax enforcement tools casts doubt on the conclusion that the Anti-Injunction Act applies. I respectfully have difficulty with that reasoning. The key point, as I see it, is that the penalty may be enforced only by the IRS, not by the U.S. Attorney or by other federal agencies. The fact that the IRS cannot use *all* of its traditional enforcement tools does not make it any less an IRS-enforced provision.

Perhaps the most important takeaway from the fact that Congress prevented the IRS from employing everything in its toolbox when enforcing the Affordable Care Act penalty provision is the following: Congress focused specifically on how this tax penalty would be collected and enforced. And Congress determined that some of the usual IRS enforcement tools were out of bounds. But Congress nonetheless did not allow taxpayers to bring pre-enforcement suits challenging the law and seeking to restrain assessment and collection of the tax penalty. Congress did not exempt the individual mandate provision from the Anti-Injunction Act. Congress's careful delineation of proper and improper enforcement tools suggests that Congress acted knowingly in not creating an exception to the Anti-Injunction Act for pre-enforcement constitutional challenges to the individual mandate provision.

The distinction is no mere technicality. If the IRS can be deprived of expected revenues by the mere filing of a lawsuit ($4 billion annually in this instance), then the Government will face increased short-term budgetary problems and potentially higher near-term deficits, as well as greater difficulties in planning for future appropriations. The Anti-Injunction Act was designed in part to alleviate those problems. Finding a tax that is collected now to be equivalent to a tax that is *never* collected thus thwarts the Act's central design.

In short, the Affordable Care Act dictates that its penalties be assessed and collected in the same manner as chapter 68 subchapter B penalties. Chapter 68 subchapter B penalties in turn must be assessed and collected "in the same manner as taxes." Taxes are insulated from pre-enforcement suits by the Anti-Injunction Act. In order for the Affordable Care Act's penalties to be assessed and collected in the same manner as the chapter 68 subchapter B penalties and thus in the same manner as taxes, the Affordable Care Act's penalties likewise must be insulated from pre-enforcement suits by the Anti-Injunction Act.[16]

---

[16] One other aspect of Section 5000A buttresses the conclusion that a taxpayer cannot bring a pre-enforcement suit challenging the individual mandate. Section 5000A(g)(1) provides that the tax penalties for failing to have health insurance "shall be paid upon notice and demand by the Secretary." That same language – "shall be paid upon notice and demand by the Secretary" – is found in the general penalty provision in chapter 68 subchapter B. *See* 26 U.S.C. § 6671(a). The requirement that penalties "shall be paid upon notice and demand by the Secretary" generally indicates that the Secretary may assess and demand payment of the tax penalties without pre-enforcement judicial interference, whether by a pre-enforcement suit or a deficiency

Absent any statutory cross-references or definitions, the term "tax" in the Anti-Injunction Act might not *itself* cover the tax penalties at issue here. But the Affordable Care Act's cross-reference to chapter 68 establishes that these tax penalties – like the tax penalties in chapter 68 – must be "assessed and collected in the same manner as taxes." Because of the cross-reference, and because taxes subject to pre-enforcement suits are not assessed and collected in the same manner as taxes insulated from pre-enforcement suits, the Anti-Injunction Act bars us from exercising jurisdiction over this case.[17]

---

proceeding in Tax Court. *Cf.* 26 U.S.C. § 6213. (If the taxpayer still refuses to pay after notice and demand, then the IRS and the taxpayer will have to resolve the dispute in enforcement proceedings.) After all, if a pre-enforcement suit could be filed to block payment of the penalties, then the tax penalties would not be paid "upon notice and demand by the Secretary," as the statute requires. Absent any textual indication to the contrary, this language further suggests that a taxpayer may not bring a pre-enforcement suit challenging the individual mandate.

[17] That conclusion finds further support when we examine how the Anti-Injunction Act applies to other Tax Code penalties that, like the Affordable Care Act penalty, are codified outside of chapter 68 but cross-reference chapter 68. For example, Sections 5114, 5684, and 5761 of the Tax Code impose tax penalties for violation of certain laws related to liquor and tobacco; all provide that the penalties "shall be assessed, collected, and paid in the same manner as taxes, as provided in section 6665(a)."

Section 6665(a), which is in chapter 68, in turn states that "penalties provided by this chapter shall be paid upon notice and demand and shall be assessed, collected, and paid in the same manner as taxes." (Section 6665(a) thus echoes Section 6671(a), the similarly worded section in chapter 68 cross-referenced by the Affordable Care Act.) The Government agrees that the tax penalties imposed under Sections 5114, 5684, and 5761 are subject

28

B

In arguing that the Anti-Injunction Act does not apply here, the majority opinion relies in part on a strained interpretation of Section 6671(a) of chapter 68 subchapter B.

Recall that Section 5000A provides that Affordable Care Act penalties for those without health insurance must be assessed and collected in the same manner as penalties under chapter 68 subchapter B, which in turn must be assessed and collected in the same manner as taxes. The relevant cross-referenced provision in chapter 68 subchapter B is Section 6671(a), which states:

The penalties and liabilities provided by this subchapter shall be paid upon notice and demand by the Secretary,

to the Anti-Injunction Act and thus insulated from pre-enforcement suits. *See* Supplemental Brief for United States at 4, *Liberty Univ. v. Geithner*, No. 10-2347, 2011 WL 3962915 (4th Cir. Sept. 8, 2011). But those provisions and their cross-references to chapter 68 cannot logically be distinguished from the Affordable Care Act and its cross-reference to chapter 68. In all of the statutes, after all, a tax "penalty" is imposed by a Tax Code provision outside chapter 68. All of those provisions require that the tax penalty be assessed and collected in the same manner as taxes. Therefore, all of those provisions – including the tax penalty in the Affordable Care Act – are subject to the Anti-Injunction Act and insulated from pre-enforcement suits. The Government counters that Sections 5114(c)(3), 5684(b), and 5761(e) all expressly refer to "taxes" in cross-referencing Section 6665(a) and thus are distinguishable from Section 5000A. But that is not a relevant distinction. As we have seen, Section 5000A(g)(1) accomplishes that same result by referring to Section 6671(a), which in turn refers to "taxes." Therefore, Section 5114, 5684, 5761, *and* 5000A penalties are all subject to the Anti-Injunction Act and insulated from pre-enforcement suits.

and shall be assessed and collected in the same manner as taxes. Except as otherwise provided, any reference in this title to "tax" imposed by this title shall be deemed also to refer to the penalties and liabilities provided by this subchapter.

The first sentence of Section 6671(a) is key for purposes of the Affordable Care Act's cross-reference and for my analysis above that the Anti-Injunction Act applies here. The Affordable Care Act and the first sentence of Section 6671(a) together mean that the Affordable Care Act's penalties for failure to have health insurance must be assessed and collected in the same manner as taxes. As explained above, these tax penalties (in chapter 68 and thus also in the Affordable Care Act) can be assessed and collected in the same manner as taxes only if they are insulated from pre-enforcement suits under the Anti-Injunction Act, as taxes are.

The majority opinion focuses on the second sentence of Section 6671(a). The second sentence equates the penalties in chapter 68 subchapter B to taxes for *all* Tax Code purposes. As the majority opinion states, that second sentence therefore appears to independently make the Anti-Injunction Act applicable to chapter 68 subchapter B penalties. The majority opinion also states that the second sentence of Section 6671(a) – unlike the first sentence – does not apply to the Affordable Care Act's penalties. From that, however, the majority opinion draws the incorrect conclusion that the Anti-Injunction Act does not apply to the Affordable Care Act's tax penalties.

The majority opinion's focus on the second sentence of Section 6671(a) is a diversion. As explained above, Section 6671(a)'s first sentence *on its own* dictates that the Anti-Injunction Act applies to chapter 68 subchapter B penalties –

and thus also to the Affordable Care Act's individual mandate penalties, which must be assessed and collected in the same manner as chapter 68 subchapter B penalties.

Indeed, when the Government initially told district courts around the country that the Anti-Injunction Act barred these suits, it too relied on the first sentence of Section 6671(a). *See* Memorandum in Support of United States' Motion to Dismiss at 15, *Mead v. Holder*, 766 F. Supp. 2d 16 (D.D.C. 2011) (No. 1:10-cv-950) ("It does not matter whether the payment sought to be enjoined is labeled a 'penalty' rather than a 'tax.' With exceptions immaterial here, the penalty is 'assessed and collected in the same manner' as other assessable penalties under the Internal Revenue Code, I.R.C. § 5000A(g)(1), and, like these other penalties, falls within the bar of the AIA. I.R.C. § 6671(a).") (some citations omitted).[18]

---

[18] The majority opinion suggests that I am breaking new ground in interpreting the first sentence of Section 6671(a) in this way. The majority opinion is incorrect. Many cases analyzing other Tax Code penalties encompassed by Section 6671(a) have concluded that the Anti-Injunction Act applies to those penalties because of the requirement in the first sentence of Section 6671(a) that the penalties be assessed and collected in the same manner as taxes. *See, e.g.*, *Kelly v. Lethert*, 362 F.2d 629, 633 (8th Cir. 1966); *Nat'l Commodity & Barter Ass'n v. United States*, 625 F. Supp. 920, 921 (D. Colo. 1986); *Griffith v. Commissioner*, 598 F. Supp. 405, 406 (N.D. Ohio 1983); *Crouch v. Commissioner*, 447 F. Supp. 385, 386 (N.D. Cal. 1978); *McAllister v. Dudley*, 148 F. Supp. 548, 550-51 (W.D. Pa. 1956).

A leading treatise similarly states: "[B]ecause § 6671(a) provides that penalties shall be assessed and collected as taxes, the Anti-Injunction Act bars taxpayers from seeking to enjoin the assessment of penalties." BITTKER ET AL., FEDERAL INCOME TAXATION OF INDIVIDUALS ¶ 51.10. It appears, moreover, that no

The second sentence of Section 6671(a), to which the majority opinion points, applies to more than just assessment and collection of taxes. That sentence equates chapter 68 subchapter B penalties to taxes for the full panoply of rights and obligations under the Tax Code. The second sentence thus gives taxpayers numerous rights with respect to imposition of chapter 68 subchapter B tax penalties that taxpayers possess with respect to imposition of taxes – to take just one example, the right to bring a civil action for damages against an IRS employee who violates any Tax Code provision in collecting a tax. 26 U.S.C. § 7433(a).

To be sure, the second sentence of Section 6671(a) is so broadly written that it arguably also makes chapter 68 subchapter B penalties equivalent to taxes for purposes of assessment and collection – which the first sentence specifically accomplishes. The majority opinion finds that redundancy problematic. But such redundancy is not unusual. It is common, after all, for a list of specific statutory requirements or prohibitions to accompany a general statutory requirement or prohibition that encompasses the specific.[19]

---

case decided before the current litigation has ever said that the first sentence of Section 6671(a) on its own is insufficient to make the Anti-Injunction Act applicable to a Tax Code penalty.

[19] *See, e.g.*, *Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 226-27 (2008) ("Congress may have simply intended to remove any doubt that officers of customs or excise were included in 'law enforcement officers.' . . . In any event, we do not woodenly apply limiting principles every time Congress includes a specific example along with a general phrase.") (brackets omitted); *Norfolk & Western Railway Co. v. American Train Dispatchers' Ass'n*, 499 U.S. 117, 129 (1991); *Harrison v. PPG Industries, Inc.*, 446 U.S. 578, 580 n.1, 589 (1980); *see also Springer v. Philippine Islands*, 277 U.S. 189, 206 (1928) ("Where a statute contains a grant of power enumerating certain things which may be done and also a

Focusing on the plain text, as we must: The Affordable Care Act says that its tax penalties must be assessed and collected in the same manner as chapter 68 subchapter B penalties. The first sentence of Section 6671(a) definitively establishes that chapter 68 subchapter B tax penalties are to be assessed and collected in the same manner as taxes. Even if the second sentence would have accomplished that same result for chapter 68 subchapter B penalties, the first sentence makes "double sure," a routine approach to legislative drafting.[20] And that first sentence – combined with the

---

general grant of power which standing alone would include these things and more, the general grant may be given full effect if the context shows that the enumeration was not intended to be exclusive.").

[20] *See Microsoft Corp. v. i4i Ltd. Partnership*, 131 S. Ct. 2238, 2249 (2011) ("There are times when Congress enacts provisions that are superfluous . . . .") (quoting *Corley v. United States*, 129 S. Ct. 1558, 1572-73 (2009) (Alito, J., dissenting)); *DePierre v. United States*, 131 S. Ct. 2225, 2232 (2011) ("Accordingly, Congress' choice to use the admittedly redundant term 'cocaine base' to refer to chemically basic cocaine is best understood as an effort to make clear that clause (iii) does not apply to offenses involving powder cocaine or other nonbasic cocaine-related substances."); *Abbott v. United States*, 131 S. Ct. 18, 29 (2010) ("This reading gives effect to the statutory language commanding that all § 924(c) offenders shall receive additional punishment for their violation of that provision, *a command reiterated three times*.") (emphasis added); *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253-54 (1992) ("Redundancies across statutes are not unusual events in drafting, and so long as there is no 'positive repugnancy' between two laws, a court must give effect to both. . . . We have stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there.") (citation omitted); *Crandon v. United States*, 494 U.S. 152, 174 (1990) (Scalia, J., concurring in judgment) ("superfluous exceptions (to 'make assurance doubly

Affordable Care Act's cross-reference – establishes that the Affordable Care Act's tax penalties must be assessed and collected in the same manner as taxes and therefore insulated from pre-enforcement suits.

The majority opinion's reference to the redundancy (or surplusage) principle here is further flawed because that principle carries force only when there are two alternative interpretations, one of which would eliminate the redundancy or surplusage. But under the majority opinion's own approach, the entire first sentence of Section 6671(a) would be surplusage. *Cf. Microsoft Corp. v. i4i Ltd. Partnership*, 131 S. Ct. 2238, 2248 (2011) ("Here, no interpretation of § 282 – including the two alternatives advanced by Microsoft – avoids excess language."). Indeed, the majority opinion's invocation of the redundancy principle with regard to the second sentence of Section 6671(a) is particularly misplaced given that the *entirety* of Section 6671(a) – both the first and second sentences – is already redundant of Section 6665(a). Section 6665(a), after all, separately establishes that all chapter 68 penalties (not just those in chapter 68 subchapter B) are to be assessed, collected, and otherwise treated as taxes.

The truth is that the broad language of the second sentence of Section 6671(a) makes redundancy with the first

---

sure') are a more common phenomenon than the insertion of utterly pointless language"); *Shook v. D.C. Fin. Responsibility & Mgmt. Assistance Auth.*, 132 F.3d 775, 782 (D.C. Cir. 1998) ("Sometimes Congress drafts statutory provisions that appear preclusive of other unmentioned possibilities – just as it sometimes drafts provisions that appear duplicative of others – simply, in Macbeth's words, 'to make assurance double sure.' That is, Congress means to clarify what might be doubtful – that the mentioned item is covered – without meaning to exclude the unmentioned ones.").

sentence inevitable here. The lesson from the redundancy in these sections and elsewhere in the Tax Code is not to read provisions out of the statute or contrary to their plain meaning, as the majority opinion would have us do. Rather, we should read the provisions according to their terms, recognizing that Congress often wants to make "double sure" – a technique so common that it has spawned its own Latin canon, *ex abundanti cautela*. *See Fort Stewart Schools v. FLRA*, 495 U.S. 641, 646 (1990) ("It might reasonably be argued, of course, that these two exceptions are indeed technically unnecessary, and were inserted out of an abundance of caution – a drafting imprecision venerable enough to have left its mark on legal Latin (*ex abundanti cautela*)."); *see also* WILLIAM SHAKESPEARE, MACBETH act 4, scene 1 ("But yet I'll make assurance double sure").[21]

In short, the first sentence of Section 6671(a) on its own dictates that chapter 68 subchapter B penalties are to be assessed and collected in the same manner as taxes. Because Affordable Care Act penalties must be assessed and collected

---

[21] Indeed, the Constitution employs this approach. *See United States v. Wiltberger*, 18 U.S. 76, 115 n.a (1820) (Marshall, C.J.) ("It seems highly probable that the expression 'maritime jurisdiction,' in the constitution, was borrowed from the language of those commissions, and was introduced *ex abundanti cautelâ*, and superadded to the term 'admiralty,' in order to obviate any doubt as to the full extent of the authority meant to be conferred."); *Brown v. United States*, 12 U.S. 110, 150-51 (1814) (Story, J., dissenting) ("If the constitution had been silent as to letters of marque and captures, it would not have narrowed the authority of congress. The authority to grant letters of marque and reprisal, and to regulate captures, are ordinary and necessary incidents to the power of declaring war. It would be utterly ineffectual without them. The expression, therefore, of that which is implied in the very nature of the grant, cannot weaken the force of the grant itself. The words are merely explanatory, and introduced *ex abundanti cautela*.").

in the same manner as chapter 68 subchapter B penalties, the Affordable Care Act's penalties likewise must be assessed and collected in the same manner as taxes. To be assessed and collected in the same manner as taxes, all of these tax penalties must be insulated from pre-enforcement suits. If we are to give effect to the plain text of the statute, the Anti-Injunction Act must bar pre-enforcement suits challenging the Affordable Care Act's penalties for failure to have health insurance.[22]

## III

In the alternative, in analysis somewhat similar to the Fourth Circuit's, I would conclude that the Anti-Injunction Act applies here because of the definition of the IRS's assessment authority provided by Section 6201 of the Tax Code. That section defines "assessable penalties" to be "taxes" for purposes of the IRS's assessment authority. The Affordable Care Act's penalty is an assessable penalty and is therefore a tax for purposes of the IRS's assessment authority under Section 6201. The Anti-Injunction Act bars suits to restrain assessment or collection of taxes. It thus bars this suit.[23]

---

[22] The majority opinion reasons that Congress could easily have said in Section 5000A: "The Anti-Injunction Act applies to these tax penalties." True, but Congress could just as easily have said: "The Anti-Injunction Act does not apply to these tax penalties." Congress did neither. We must analyze the statutory terms that Congress employed, not those that we wish Congress had employed.

[23] The Fourth Circuit relied on Section 6201 to conclude that the Anti-Injunction Act barred a pre-enforcement suit challenging the Affordable Care Act's individual mandate. *See Liberty Univ. v. Geithner*, No. 10-2347, 2011 WL 3962915 (4th Cir. Sept. 8, 2011).

To spell this out, let's again go to the text. Section 6201 authorizes and requires the IRS[24] to make "assessments of all taxes (including interest, additional amounts, additions to the tax, and assessable penalties) imposed by this title." 26 U.S.C. § 6201(a). Importantly, Section 6201 thus defines taxes for assessment purposes as "including" additional amounts, additions to the tax, and assessable penalties, which are the three kinds of civil penalties imposed by the Tax Code and assessed by the IRS.[25]

Of particular relevance here, Section 6201 defines "taxes" to include "assessable penalties" that are "imposed by this title." Subchapter B of chapter 68 of the Tax Code is entitled "Assessable Penalties." The Affordable Care Act requires that the "penalty" for failure to have health insurance be "assessed and collected in the same manner as an assessable penalty under subchapter B of chapter 68." 26

---

Although I do not agree with every detail of the Fourth Circuit's reasoning, I do agree with its bottom-line conclusion that Section 6201 defines the Affordable Care Act penalty to be a tax for purposes of the IRS's assessment authority, which in turn means that the Affordable Care Act penalty is insulated from pre-enforcement suits by the Anti-Injunction Act.

[24] The statute refers to the Secretary of the Treasury, who in turn has delegated assessment and collection responsibility to the IRS, specifically to the Commissioner of Internal Revenue. *See* 26 U.S.C. § 7701(a)(11)(B); *see also, e.g.*, 26 C.F.R. §§ 301.6201-1, 301.7701-9 (2011). For convenience, I will refer here to the IRS.

[25] The Anti-Injunction Act generally does not apply to penalties that are imposed outside of the Tax Code and enforced by federal government officials or agencies other than the IRS. *See FEA v. Algonquin SNG, Inc.*, 426 U.S. 548, 558 n.9 (1976) (Act does not apply in case involving penalties imposed by the President); *Mulford v. Smith*, 307 U.S. 38, 46-47 (1939) (Act does not apply in case involving penalties imposed by Secretary of Agriculture).

U.S.C. § 5000A(g)(1). Because the Affordable Care Act penalty is a Tax Code "penalty" that is to be "assessed" by the IRS – and, moreover, is to be assessed "in the same manner as" a chapter 68 subchapter B "assessable penalty" – it is an "assessable penalty." Because the Affordable Care Act penalty is an assessable penalty and because Section 6201 classifies assessable penalties as taxes for purposes of the IRS's assessment power, the Affordable Care Act penalty is a tax for purposes of the IRS's assessment authority under Section 6201.

The Anti-Injunction Act in turn provides that "no suit for the purpose of restraining the assessment or collection of any tax shall be maintained in any court by any person." 26 U.S.C. § 7421(a). Given that Section 6201 defines "assessments of all taxes" to include assessment of the Affordable Care Act penalty at issue here, and given that the Anti-Injunction Act bars suits to restrain the "assessment . . . of any tax," the Anti-Injunction Act bars a suit to restrain the assessment of these Affordable Care Act tax penalties just as it bars a suit to restrain the assessment of taxes. Therefore, plaintiffs' suit is barred by the Anti-Injunction Act.[26]

---

[26] That's not all. Sections 6301, 6302, and 6303 provide that the IRS must *collect* any tax that has been assessed pursuant to Sections 6201-6203. Because the IRS's collection duty tracks the IRS's assessment duty, the IRS's collection duty necessarily encompasses all of the penalties that have been assessed by the IRS pursuant to Sections 6201-6203. Given that (i) these Affordable Care Act penalties are taxes for purposes of the IRS's assessment power and (ii) the statute in turn requires the IRS to collect all assessments, it follows that the Affordable Care Act's penalties are taxes for purposes of the IRS's collection authority. So plaintiffs' suit, if successful, would prevent the IRS from collecting taxes as defined by Sections 6301, 6302, and 6303. And the Anti-Injunction

How does the majority opinion respond to this? The majority opinion simply asserts that the Affordable Care penalty is not an assessable penalty under Section 6201 and thus is not covered by that section. I find the majority opinion's reasoning on this point quite unpersuasive.

The majority opinion insists that the only "assessable penalties" in the Tax Code are those listed in chapter 68 subchapter B. That is incorrect. Section 6201 – which defines the IRS's assessment authority – speaks of "assessable penalties" imposed "by this title," not just of assessable penalties imposed by chapter 68 of the title.[27] Indeed, there are numerous "assessable penalties" in the Tax Code that are outside of chapter 68. For example, chapter 61 contains several assessable penalties, and the IRS itself states that the "assessable penalties" in the Code are not all in chapter 68. *See* INTERNAL REVENUE MANUAL 20.1.9.1.1 (Apr. 22, 2011) (a number of penalties in Sections 6038-6038C of chapter 61 "are *assessable penalties* and are not covered by deficiency procedures"); *see also* 26 U.S.C. §§ 6038(b), 6038A(d), 6038B(c), 6038C(c).

---

Act bars suits to restrain the "collection of any tax." Therefore, plaintiffs' suit is barred by the Anti-Injunction Act for that additional reason as well.

[27] The majority opinion also suggests that all the penalties in chapter 68 relate to late filing, erroneous reporting, and insufficient payment. But that's inaccurate as well. *See, e.g.*, 26 U.S.C. § 6720A (chapter 68 penalty for sale of diesel fuel that does not meet EPA regulations); 26 U.S.C. § 6720C (chapter 68 penalty for failure to notify health plan of cessation of eligibility for COBRA premium assistance). In any event, the majority opinion's claim on that point is irrelevant because Section 6201 plainly defines taxes to include all assessable penalties "imposed by this title," not just by chapter 68 of the title.

Moreover, if the Affordable Care Act "penalty" is not an "assessable penalty," what kind of Tax Code civil penalty does the majority opinion think it is? The two other options are an "additional amount" or an "addition to the tax." After all, additional amounts, additions to the tax, and assessable penalties are the civil penalties imposed by the Tax Code and assessed by the IRS. Numerous provisions of the Code refer to additional amounts, additions to the tax, and assessable penalties as the universe of Tax Code civil penalties that are assessed by the IRS. *See, e.g.*, 26 U.S.C. §§ 860(h), 6155(a), 6201(a), 6202, 6321, 6324A(a), 6601(e)(2), 6602, 7122(b), 7522(a). But all three categories of civil penalties are defined by Section 6201 to be "taxes" for purposes of the IRS's assessment authority. So even if the Affordable Care Act penalty were an additional amount or an addition to the tax, it would still be a tax under Section 6201 and the Anti-Injunction Act would still apply. The majority opinion's effort to wriggle out of Section 6201 is futile.

In sum, the Affordable Care Act penalties at issue here are defined to be taxes for purposes of the IRS's assessment power under Section 6201. That necessarily means that these penalties also are taxes for purposes of the Anti-Injunction Act's protection against pre-enforcement suits seeking to restrain the IRS's assessment of "any tax." For that alternative and independent reason, the Anti-Injunction Act bars the Court from deciding this suit.[28]

---

[28] Section 7421 of the Code codifies the Anti-Injunction Act. The companion provision, Section 7422, requires exhaustion of administrative remedies for taxpayers who bring tax refund suits. Section 7422 provides: "No suit or proceeding shall be maintained in any court for the recovery of any internal revenue tax alleged to have been erroneously or illegally assessed or collected, *or of any penalty claimed to have been collected without authority*, or of any

IV

Trying a different approach, the majority opinion separately contends that the Anti-Injunction Act does not apply to plaintiffs' suit *even if* the Affordable Care Act penalties *are taxes* for purposes of the Anti-Injunction Act. According to the majority opinion, plaintiffs are challenging only the mandate to purchase health insurance and not the tax penalties imposed for violating the mandate (even though the mandate is enforced solely through these tax penalties). The majority opinion argues that the Anti-Injunction Act does not

---

sum alleged to have been excessive or in any manner wrongfully collected, until a claim for refund or credit has been duly filed" with the IRS. 26 U.S.C. § 7422(a) (emphasis added). Section 7422, by its terms, contemplates that taxpayers who pay tax penalties may challenge those penalties in refund suits against the IRS. The juxtaposition of the Anti-Injunction Act (Section 7421) and the refund suit provision (Section 7422) reinforces the general principle that taxpayers are to pay first and litigate later, including with respect to tax penalties such as those contained in Section 5000A of the Affordable Care Act. *See Enochs v. Williams Packing & Navigation Co.*, 370 U.S. 1, 7 (1962) (Anti-Injunction Act requires "that the legal right to the disputed sums be determined in a suit for refund" and thereby ensures the Government "prompt collection of its lawful revenue").

It has been suggested that Section 7422's express reference to penalties might indicate that Section 7421 does not cover penalties, because Section 7421 refers only to taxes. But my analysis of Section 7421 does not rely on the term "tax" in isolation (in which case that critique might have some force). Rather, my analysis relies on two independent and alternative statutory cross-references which make clear that the Affordable Care Act's penalties for failing to have health insurance are taxes for purposes of the IRS's assessment and collection power (Section 6201) and are to be assessed and collected "in the same manner as taxes" (Section 6671).

apply when a plaintiff purports to challenge the regulatory purpose or effect of a tax. That is the same reasoning this Court adopted to get around the Anti-Injunction Act in our 1973 decision in *Americans United*. The problem for the majority opinion here is that the Supreme Court emphatically rejected this Court's reasoning in that case, calling it "unpersuasive" and "circular." *Alexander v. "Americans United" Inc.*, 416 U.S. 752, 760-62 (1974), *rev'g* 477 F.2d 1169 (D.C. Cir. 1973); *see also Bob Jones Univ. v. Simon*, 416 U.S. 725 (1974). There is no call for a sequel.

The majority opinion's effort to characterize plaintiffs' suit as a challenge to the mandate and not to the tax penalty is wrong on the facts and wrong on the law. It is wrong on the facts because plaintiffs' complaint repeatedly and unmistakably asks for relief from the Affordable Care Act's tax penalties.[29] It is wrong on the law because, in any event,

---

[29] Contrary to the majority opinion's suggestion, plaintiffs' complaint seeks to restrain the assessment and collection of the tax penalties. Plaintiffs' complaint requests "a permanent injunction against the enforcement of the individual mandate provisions." First Amended Complaint at 26, *Mead v. Holder*, 766 F. Supp. 2d 16 (D.D.C. 2011) (No. 1:10-cv-950). Of course, the "enforcement" contemplated by the statute is the assessment and collection of the tax penalties by the IRS. Therefore, the injunctive relief that plaintiffs are seeking to obtain "against the enforcement of the individual mandate provisions" is an injunction barring the IRS from assessing and collecting the Affordable Care Act tax penalties for failing to have health insurance.

The complaint also describes in detail the burden that the Affordable Care Act tax penalties would impose on plaintiffs' household finances – details supporting plaintiffs' request for injunctive relief against the tax penalty. *See id.* at 6-16 (stating each plaintiff "will be forced to pay – under strong objection – the annual shared responsibility payment" and estimating each plaintiff's shared responsibility payment for "each taxable year");

the Supreme Court has squarely held that a taxpayer cannot avoid the Anti-Injunction Act by purporting to challenge the regulatory purpose or effect of a tax.

Regulatory taxes regulate behavior by imposing higher taxes on disfavored behavior and lower taxes on favored behavior. *See Sonzinsky v. United States*, 300 U.S. 506, 513 (1937). In cases involving regulatory taxes, the Supreme Court has flatly rejected evasion of the Anti-Injunction Act through the kind of semantics employed by the majority opinion here. In both *Bob Jones* and *Americans United*, the plaintiff non-profit organizations argued that they were challenging the IRS's termination of their tax-exempt status for allegedly engaging in disfavored conduct (race discrimination in one case and improper lobbying in the other), not the increased taxes they would have to pay because of the denial of their tax-exempt status. The organization in *Americans United* even offered to pay its extra taxes regardless of the outcome of the case in order to show that it was not seeking to avoid payment of taxes. *See* 416 U.S. at 760. The Supreme Court held that the Anti-Injunction Act still barred the suits, stating that taxpayers cannot end-run the Anti-Injunction Act by claiming that they object to a tax law's regulatory effect and not the tax itself. The Court further stated that taxpayers cannot evade the Anti-Injunction Act by claiming that the Government's purpose in imposing the tax was to regulate behavior more than to raise revenue. The key inquiry, according to the Supreme Court, is the suit's impact

_____

*id.* at 6-16 (each plaintiff is "compelled to adjust" his or her "finances now, by setting aside money, and will continue to do so, to pay the annual shared responsibility payment"); *id.* at 3 ("The total amount of shared responsibility payments that Plaintiffs must prepare themselves to pay through 2020 *may be greater* than $27,265 depending upon their income levels during each taxable year and cost of living adjustments.").

on tax collection: whether the taxpayers' suit, if successful, would reduce the plaintiffs' taxes – or indeed "anyone's taxes." *Id.* If so, then the Anti-Injunction Act applies. *See Bob Jones*, 416 U.S. at 738-42; *Americans United*, 416 U.S. at 760-62.

The Supreme Court later summarized that principle this way: "Because the suit would have restrained the collection of income taxes from the taxpayer and its contributors, as well as the collection of federal social security and unemployment taxes from the taxpayer, the Court concluded that the suit was an action to restrain the assessment or collection of any tax within the meaning of the Anti-Injunction Act." *South Carolina v. Regan*, 465 U.S. 367, 375 (1984) (internal quotation marks omitted).[30]

*Bob Jones* and *Americans United* therefore mean the following: If the only sanction attached to a federal law that regulates private behavior is the imposition of a civil tax exaction that falls within the coverage of the Anti-Injunction Act, then the Anti-Injunction Act applies and, absent a recognized exception, precludes a pre-enforcement suit challenging that law. The Anti-Injunction Act cannot be evaded by characterizing the suit as a challenge only to the

---

[30] The Supreme Court has also held that "the constitutional nature of a taxpayer's claim" is of "no consequence under the Anti-Injunction Act." *Americans United*, 416 U.S. at 759. The Court has repeated the same point in several other cases. *See, e.g.*, *United States v. Clintwood Elkhorn Mining Co.*, 553 U.S. 1, 10 (2008) ("This is so even though the Anti-Injunction Act's prohibitions impose upon the wronged taxpayer requirements" that "the taxpayer must succumb to an unconstitutional tax, and seek recourse only after it has been unlawfully exacted."); *see also United States v. American Friends Service Committee*, 419 U.S. 7, 11 (1974); *Bailey v. George*, 259 U.S. 16, 20 (1922).

regulatory aspect of a tax. The Act is more than a pleading hurdle. A regulatory tax, at least so long as it actually would raise some revenue, is a tax within the meaning of the Anti-Injunction Act. *See Bob Jones*, 416 U.S. at 738-48.[31]

In attempting to distinguish away *Bob Jones* and *Americans United*, the majority opinion says those cases apply only if the regulation and tax are "inextricably linked." Maj. Op. at 17. But the Supreme Court did not use that phrase in its opinions in *Bob Jones* and *Americans United*, and it is unclear what the majority opinion here intends it to mean. What the Supreme Court did say is that a suit challenging a regulatory tax is barred by the Anti-Injunction Act if the suit would restrain the IRS's assessment or

---

[31] The Court has long rejected arguments that a Due Process Clause violation occurs when a statute compels a taxpayer to pay an allegedly unconstitutional or otherwise illegal tax before being able to challenge its legality in a refund suit. *See Bob Jones*, 416 U.S. at 746-47 (rejecting university's argument that forcing it to pay some taxes first and then litigate its claim in a refund suit "will deny it due process of law"); *see also Phillips v. Commissioner*, 283 U.S. 589, 597 (1931) (summary tax collection procedure "satisfies the requirements of due process because two alternative methods of eventual judicial review are available to the" affected party – "bringing an action, either against the United States or the collector, to recover the amount paid"); *Dodge v. Osborn*, 240 U.S. 118, 122 (1916).

To be sure, the Due Process Clause requires an exception to the Anti-Injunction Act when the tax is so high as to render the purported tax not just a disincentive or civil penalty, but a *criminal* prohibition. *See, e.g.*, *Lipke v. Lederer*, 259 U.S. 557, 560-62 (1922); *see also Bob Jones*, 416 U.S. at 743; *United States v. One Ford Coupe Auto.*, 272 U.S. 321, 329 (1926); *Graham v. Du Pont*, 262 U.S. 234, 257 (1923). But otherwise, the Anti-Injunction Act applies to regulatory taxes if the taxpayer's suit would prevent the IRS from assessing or collecting "anyone's taxes."

collection of taxes. Plaintiffs' suit here would do just that; therefore, it is barred.[32]

Moreover, the Supreme Court long ago held that the Anti-Injunction Act applies even to a regulatory tax that effectively prohibits (or mandates) conduct, not just one that disincentivizes (or incentivizes) conduct. *See Bailey v. George*, 259 U.S. 16 (1922); *Bailey v. Drexel Furniture Co.*, 259 U.S. 20 (1922). In the twin *Bailey* cases, the Supreme Court recognized that the Child Labor Tax didn't just discourage employment of child labor; it in effect prohibited it. The Court nonetheless held that the Anti-Injunction Act barred a pre-enforcement suit challenging the prohibition. That *Bailey* principle remains good law, as the Supreme Court explained in *Bob Jones*: "Moreover, petitioner's argument fails to give appropriate weight to *Bailey* v. *George*, 259 U.S. 16 (1922). In that case, the Court held that the Act blocked a

---

[32] In cases involving state taxes under the related State Tax Injunction Act, a few lower courts have sometimes allowed taxpayers to challenge the regulatory aspect of a regulatory exaction. Three points concerning those State Tax Injunction Act cases: First, this case concerns the federal Anti-Injunction Act, and *Bob Jones* and *Americans United* are directly on point in saying that the federal Anti-Injunction Act bars suits that purport to target the regulatory aspect of a federal tax. Second, through its cross-references, the federal Tax Code defines what exactions qualify as taxes for purposes of the Anti-Injunction Act. *See* 26 U.S.C. §§ 6201, 6671, 5000A. The State Tax Injunction Act does not. So to the extent there's a difference in case law, that difference stems from the distinct texts and contexts of the two statutes. Third, with respect to the State Tax Injunction Act, a recent en banc Seventh Circuit decision authored by Judge Posner explained in detail why it is wrong even under the State Tax Injunction Act to allow a pre-enforcement challenge to the regulatory aspect of a state tax. *See Empress Casino Joliet Corp. v. Balmoral Racing Club, Inc.*, 651 F.3d 722, 730 (7th Cir. 2011).

pre-enforcement suit to enjoin collection of the federal Child Labor Tax, although the tax was challenged as a regulatory measure beyond the taxing power of Congress. Significantly, the Court announced *Bailey* v. *George* on the same day that it issued *Bailey* v. *Drexel Furniture Co.*, 259 U.S. 20 (1922), a tax-refund case in which the Court struck down the Child Labor Tax Law as unconstitutional on the grounds that the taxpayer attempted to raise prematurely in *Bailey* v. *George.*" 416 U.S. at 740-41.

So to the extent the majority opinion here tries to argue that there's an Anti-Injunction Act distinction between (i) a civil tax provision that creates a mandate or prohibition and (ii) a tax provision that creates an incentive or disincentive, that distinction does not work. The relevant Anti-Injunction Act question is whether plaintiffs' suit, if successful, would reduce their tax liability. Here, plaintiffs' suit, if successful, would reduce (to zero) their tax penalties for failure to maintain health insurance. Under *Bob Jones* and *Americans United*, the Anti-Injunction Act therefore applies.[33]

---

[33] The majority opinion tries to attach significance to the different ways that Congress relieved individuals from the mandate. Some are excluded from the definition of "applicable individual" (for example, illegal aliens), and some are "exempt" (for example, low-income individuals). Congress used different methods in part because other provisions of the Act distinguish the different categories. *See* Patient Protection and Affordable Care Act, Pub. L. No. 111-148, § 1302(e)(2)(B), 124 Stat. 119, 168 (2010) (permitting certain applicable individuals who are exempt from the penalty to enroll in catastrophic health insurance plans). In any event, this argument is a sideshow: No matter how much the majority opinion tries to avoid the point, plaintiffs here (and elsewhere) have sued because they don't want to pay tax penalties for failure to have health insurance. And let's consider the majority opinion's rather fanciful hypothetical (which is not presented by

Given the clarity of the relevant Supreme Court precedent, the Government, which otherwise now argues that the Anti-Injunction Act does not bar this suit, still expressly disavows the rationale set forth here by the majority opinion. As the Solicitor General recently told the Supreme Court: "The Anti-Injunction Act, when applicable, bars any suit seeking relief that would *necessarily preclude the assessment or collection of taxes* under the Internal Revenue Code, *regardless of the plaintiff's professed motivation for the suit*." Brief for United States in Opposition at 16, 22 & n.9, *Liberty Univ. v. Geithner*, No. 11-438 (U.S. Oct. 18, 2011) (citing *Bob Jones*, 416 U.S. at 731-32) (internal quotation marks omitted) (emphasis added).

Finally, as a last try, the majority opinion suggests that these Affordable Care Act tax penalties aren't designed to raise revenue for the Government and, for that reason, may not qualify as taxes for purposes of the Anti-Injunction Act. But the Court in *Bob Jones* held that regulatory taxes are covered by the Anti-Injunction Act as long as they raise some revenue. *See* 416 U.S. at 741 n.12, 743 n.17; *cf. Sonzinsky*, 300 U.S. at 514. Here, the Congressional Budget Office has estimated the Government will collect about $4 billion a year in revenue from the Affordable Care Act's tax penalties on

---

this case): If someone who is an "applicable individual" but exempt from the penalties nonetheless wants to challenge the Act, is found to have standing, and prevails, the necessary implication of that litigation victory would be to reduce taxes on those who are not exempt. As the *Americans United* case made clear, however, the Anti-Injunction Act would still bar such a suit; that case expressly barred a suit that would reduce "anyone's taxes," even if it would not reduce the plaintiff's taxes. 416 U.S. at 760. The majority opinion's attempt to wring significance out of the different modes of statutory exceptions in the individual mandate provision is valiant but unavailing.

those without health insurance.  *See* Letter from Douglas W. Elmendorf, Director, Cong. Budget Office, to Sen. Harry Reid tbl.3 (Mar. 11, 2010).  To put it in concrete terms, that would pay the annual salaries of about 100,000 members of the U.S. Military.  That's real revenue.

In short, we cannot avoid the Anti-Injunction Act either by characterizing plaintiffs' complaint as a challenge to the mandate and not to the tax penalty, or by characterizing the Government's goal as regulating the decision to buy health insurance rather than as raising revenue.

V

Plaintiffs and the Government have suggested, as have a host of outside commentators, that the courts should decide the constitutionality of the individual mandate provision now because the country has a pressing need for an immediate judicial resolution.  I respect that argument.  But prudential considerations of that sort cannot override the text of a statute that limits our jurisdiction.  There is no "compelling prudential considerations" exception to the Anti-Injunction Act.  In any event, the relevant prudential considerations on balance support our waiting to decide this case until 2015, in tax refund or enforcement suits that are brought after the mandate has taken effect.

A

Contrary to the suggestions of some, we cannot simply disregard the Anti-Injunction Act.  The Supreme Court has emphasized that the desire for a final judicial decision on the constitutionality of a law cannot trump constitutional or statutory limits on the judicial power.

In *Raines v. Byrd*, for example, the Supreme Court considered the constitutionality of the Line Item Veto Act, an issue even more fundamental to government operations and budgetary issues than the current litigation over the individual mandate. But the Court explained that the preference for a prompt judicial resolution of the legislation's constitutionality could not overcome constraints on the Court's jurisdiction – in that case, the Constitution's standing requirement: "In the light of this overriding and time-honored concern about keeping the Judiciary's power within its proper constitutional sphere, we must put aside the natural urge to proceed directly to the merits of this important dispute and to 'settle' it for the sake of convenience and efficiency." 521 U.S. 811, 820 (1997) (footnote omitted).

Some have contended, however, that Congress would have wanted the courts to decide this case now, notwithstanding the Anti-Injunction Act. But Congress did not express any such alleged intent in the text of the Affordable Care Act. The parties cite no committee report or even an individual statement by a Member of Congress expressing the view that courts should decide challenges to the individual mandate immediately, despite the Anti-Injunction Act. So even if we employ the most generous approach to legislative history, we find no support for this argument. *Cf. Puerto Rico Dep't of Consumer Affairs v. Isla Petroleum Corp.*, 485 U.S. 495, 501 (1988) ("unenacted approvals, beliefs, and desires are not laws").

The invocation of presumed congressional intent is particularly inappropriate here because Congress clearly devoted careful attention to the tax enforcement details of the individual mandate provision. Congress specifically barred the IRS from using some of its traditional tools to enforce the mandate. But Congress did not create an exception to the

Anti-Injunction Act to allow pre-enforcement suits challenging the constitutionality of the mandate. Here as elsewhere, courts should not upend the balance Congress struck in the statutory text.

Some have said that the health insurance industry prefers a decision now and that Congress would have wanted courts to accommodate that concern. That is certainly a reason Congress could have decided – and still could decide – to exempt this statute from the Anti-Injunction Act.[34] After all, the voice of the health insurance industry was heard when this legislation was crafted. But Congress did not exempt the individual mandate provision from the Anti-Injunction Act. We cannot rewrite the Affordable Care Act to accommodate an alleged congressional intent to follow the apparent wishes of the health insurance industry.

Some have suggested that the Anti-Injunction Act does not apply because these suits have been brought so far in advance of the mandate's 2014 effective date. But there is no "early-bird special" exception to the Anti-Injunction Act. And creating such an exception would pose a host of arbitrary line-drawing problems. The proper audience for such an argument is Congress, which can always carve out an exemption to the Anti-Injunction Act or set up a special judicial review proceeding of the kind employed for the Line Item Veto Act or the Bipartisan Campaign Reform Act. But Congress has not done so, and we must adhere to the congressional choice reflected in the statutory text. *See Bob*

---

[34] *Bob Jones* squarely held that there is no "great harm" exception to the Anti-Injunction Act. 416 U.S. 725, 745 (1974). The Court emphasized that Congress is the proper body to create exceptions. And indeed, after *Bob Jones*, Congress carved out a narrow exception to allow pre-enforcement challenges to the IRS's determinations of tax-exempt status.

*Jones Univ. v. Simon*, 416 U.S. 725, 750 (1974) ("But this matter is for Congress, which is the appropriate body to weigh the relevant, policy-laden considerations, such as the harshness of the present law . . . .").

If Congress wants the courts to decide the individual mandate suits now, Congress can always remove the jurisdictional limit; the Anti-Injunction Act's jurisdictional bar is statutory, not constitutional. Absent such congressional action, however, we must adhere to the statutory constraints on our jurisdiction no matter how much the parties might want us to jump the jurisdictional rails and decide this case now.

B

Even if we could alter our interpretation of the Anti-Injunction Act based on prudential considerations, those considerations on balance support our waiting to decide this case until 2015 (in tax refund or enforcement suits brought after the mandate has taken effect). By waiting, we would respect the bedrock principle of judicial restraint that courts avoid prematurely or unnecessarily deciding constitutional questions.

The Supreme Court recently summarized those essential tenets while declining to reach a vital question about the constitutionality of Section 5 of the Voting Rights Act:

> That constitutional question has attracted ardent briefs from dozens of interested parties, but the importance of the question does not justify our rushing to decide it. Quite the contrary: Our usual practice is to avoid the unnecessary resolution of constitutional questions. We agree that the district is eligible under the

Act to seek bailout. We therefore reverse, and do not reach the constitutionality of § 5. . . .

In assessing those questions, we are keenly mindful of our institutional role. We fully appreciate that judging the constitutionality of an Act of Congress is the gravest and most delicate duty that this Court is called on to perform. The Congress is a coequal branch of government whose Members take the same oath we do to uphold the Constitution of the United States. . . .

We will not shrink from our duty "as the bulwark of a limited constitution against legislative encroachments," The Federalist No. 78, p. 526 (J. Cooke ed. 1961) (A. Hamilton), but it is a well-established principle governing the prudent exercise of this Court's jurisdiction that normally the Court will not decide a constitutional question if there is some other ground upon which to dispose of the case.

*Northwest Austin Municipal Utility District Number One v. Holder*, 129 S. Ct. 2504, 2508, 2513 (2009) (some citations, internal quotation marks, and brackets omitted).

Although the *Northwest Austin* Court was addressing the constitutional avoidance canon, the general principles it articulated about avoiding premature or unnecessary constitutional decisions apply to this case as well.[35]

---

[35] The Supreme Court has repeated that point many times. *See, e.g.*, *Elk Grove Unified School District v. Newdow*, 542 U.S. 1, 11 (2004) ("The command to guard jealously and exercise rarely our power to make constitutional pronouncements requires strictest adherence when matters of great national significance are at stake. Even in cases concededly within our jurisdiction under Article III,

53

C

The principle that we avoid premature or unnecessary constitutional decisions applies with special force here. That's because if we do not decide the constitutional issue now, we may *never* have to decide it.

*First*, this case could disappear by 2015 because, by then, Congress may fix the alleged constitutional shortcoming and ensure that the Affordable Care Act's individual mandate provision fits comfortably within Congress's Taxing Clause power. To be clear, I do not take a position here on whether the statute as *currently* written is justifiable under the Taxing Clause or the Commerce Clause. What I am saying is that the only potential Taxing Clause shortcoming in the current individual mandate provision appears to be relatively slight. And just a minor tweak to the current statutory language would definitively establish the law's constitutionality under

---

we abide by a series of rules under which we have avoided passing upon a large part of all the constitutional questions pressed upon us for decision.") (citation, internal quotation marks, and brackets omitted); *Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 474 (1982) ("this Court has refrained from passing upon the constitutionality of an act of the representative branches unless obliged to do so in the proper performance of our judicial function") (citation, internal quotation marks, and brackets omitted); *Ashwander v. TVA*, 297 U.S. 288, 346-47 (1936) (Brandeis, J., concurring) ("The Court will not anticipate a question of constitutional law in advance of the necessity of deciding it. It is not the habit of the Court to decide questions of a constitutional nature unless absolutely necessary to a decision of the case.") (footnote, citations, and internal quotation marks omitted); *cf. Schlesinger v. Reservists Committee to Stop the War*, 418 U.S. 208 (1974); *Ex parte Levitt*, 302 U.S. 633 (1937).

the Taxing Clause (and thereby moot any need to consider the Commerce Clause).[36]

The only reason[37] the current statute *may not* suffice under the Taxing Clause is that Section 5000A arguably does

---

[36] Earlier in this opinion, I explained that the Anti-Injunction Act applies to the tax penalty at issue here because of how the various statutory provisions, cross-references, and definitions in the Tax Code fit together. As the Supreme Court has indicated, the fact that the Anti-Injunction Act applies does not necessarily mean the tax penalty is permissible under the Taxing Clause. *Compare Bailey v. George*, 259 U.S. 16 (1922) (pre-enforcement challenge to exaction is barred by the Anti-Injunction Act), *with Bailey v. Drexel Furniture Co.*, 259 U.S. 20 (1922) (in refund suit, holding that the same exaction is invalid under the Taxing Clause).

Plaintiffs' suit, if successful, would reduce their payment of taxes (and the tax is not a criminal prohibition such that the Due Process Clause would require a pre-enforcement suit to be available). That's all that's needed to find the Anti-Injunction Act applicable. That is not necessarily all that's needed to justify a civil penalty under the Taxing Clause.

[37] It is true that plaintiffs advance a variety of other arguments why the Affordable Care Act's penalties for failing to have health insurance cannot be justified under the Taxing Clause. But those alternative arguments all appear to be definitively foreclosed by Supreme Court precedent. First, contrary to plaintiffs' contention, the Taxing Clause authorizes regulatory taxes, at least so long as the tax raises some revenue, as it does here. *See United States v. Sanchez*, 340 U.S. 42, 44-45 (1950); *Sonzinsky v. United States*, 300 U.S. 506, 513-14 (1937). Moreover, the fact that an exaction is not labeled a tax does not vitiate Congress's power under the Taxing Clause. *See License Tax Cases*, 72 U.S. 462, 471 (1867) ("The granting of a license, therefore, must be regarded as nothing more than a mere form of imposing a tax, and of implying nothing except that the licensee shall be subject to no penalties under national law, if he pays it."). Nor does it matter that Congress did not explicitly cite the Taxing Clause when enacting the legislation.

not just incentivize certain kinds of lawful behavior but also mandates such behavior. Section 5000A provides: "An applicable individual *shall* for each month beginning after 2013 ensure that the individual, and any dependent of the individual who is an applicable individual, is covered under minimum essential coverage for such month." 26 U.S.C. § 5000A(a) (emphasis added).

Therefore, beginning in 2014, a citizen who does not maintain health insurance might be acting *illegally*.[38] The Taxing Clause has not traditionally authorized a legal prohibition or mandate, as opposed to just a financial disincentive or incentive.[39] Another source of constitutional

---

*See Woods v. Cloyd W. Miller Co.*, 333 U.S. 138, 144 (1948) ("The question of the constitutionality of action taken by Congress does not depend on recitals of the power which it undertakes to exercise."). Finally, neither plaintiffs here nor plaintiffs in the other Affordable Care Act cases have, so far as I am aware, argued that the amount of the Affordable Care Act's exaction is so high as to be a criminal punishment and thus unjustifiable under the Taxing Clause for that reason. Nor could they. *Cf. Dep't of Revenue of Mont. v. Kurth Ranch*, 511 U.S. 767, 778-81 (1994); *Sonzinsky*, 300 U.S. at 513.

[38] At oral argument, counsel for the Government argued that a citizen who refused to obtain health insurance would still be acting lawfully. If that were true, the mandate would presumably pass muster under the Taxing Clause. But it is not evident that the statutory language is fairly susceptible to such an interpretation. That said, perhaps the canon of constitutional avoidance would allow such an interpretation of this provision and thereby squeeze it within the Taxing Clause. *Cf. Northwest Austin Municipal Utility District Number One*, 129 S. Ct. 2504.

[39] The Taxing Clause and the Necessary and Proper Clause plainly do support prohibitions and mandates related to compliance with tax reporting, filing, and payment obligations, as opposed to civil penalty provisions imposing prohibitions or mandates on

authority – for example, the Commerce Clause – has customarily been thought necessary to justify such prohibitions or mandates.[40]

Many have contended, however, that a legal mandate with a civil tax penalty for non-compliance is economically indistinguishable from a traditional regulatory tax if the amounts of the exactions are the same. Such an argument assumes that citizens care only about economic incentives and not also about complying with The Law. Plaintiffs vigorously contest that assertion. According to plaintiffs, the United States does not necessarily consist of 310 million people who have over-absorbed their Posner and equate (i) a traditional regulatory tax that incentivizes or disincentivizes certain behavior and (ii) a legal mandate or prohibition accompanied by a tax penalty of the same amount. After all, plaintiffs say, common sense tells us that many citizens want to be law-abiding (and known as law-abiding), and that their desire to

---

underlying private behavior (for example, a mandate to have health insurance).

[40] Although the courts have not had occasion to explain this distinction clearly (perhaps because most extant federal prohibitions in the social policy arena have been comfortably authorized by the Commerce Clause), the apparent difference was once cogently described by the Solicitor General: "It may not be easy to draw a line of demarcation between a penalty and a tax, but the line of demarcation seems to be that, where the statute prohibits the doing of an act and as a sanction imposes a pecuniary punishment for violating the act, then it is a penalty, and not a tax at all; but, where the thing done is not prohibited, but, with respect to the privilege of doing it, an excise tax is imposed, it is none the less a tax, even though it be, in its practical results, prohibitive." Argument of Solicitor General in *Bailey v. Drexel Furniture Co.*, *reported in* 259 U.S. at 21-22.

be law-abiding affects their behavior.[41]  For purposes of the Taxing Clause, mandates and prohibitions might be one step beyond the traditional kinds of regulatory taxes that the Taxing Clause has authorized.

But this discussion about the *potential* problem with the Government's Taxing Clause argument also shows how easily Congress could eliminate any such potential problem.  For example, Congress might keep the current statutory language and payment amounts and simply add a provision as basic as: "The taxpayer has a lawful choice either to maintain health insurance or make the payment to the IRS required by Section 5000A(a)-(c)."  Or Congress might retain the exactions and payment amounts as they are but eliminate the legal mandate language in Section 5000A, instead providing something to the effect of:  "An applicable individual without minimum essential coverage must make a payment to the IRS on his or her tax return in the amounts listed in Section 5000A(c)."  Or Congress could adopt the approach from the House-passed bill, which expressly created a tax incentive and plainly satisfied the Taxing Clause.

Any of those options – and others as well – would ensure that this provision operates as a traditional regulatory tax and readily satisfies the Taxing Clause.  *See United States v. Sanchez*, 340 U.S. 42, 44 (1950) (even a tax with "regulatory character and prohibitive burden" "does not cease to be valid merely because it regulates, discourages, or even definitely

---

[41]  *See* OFFICE OF TAX POLICY, DEP'T OF THE TREASURY, REPORT TO THE CONGRESS ON PENALTY AND INTEREST PROVISIONS OF THE INTERNAL REVENUE CODE 36 (1999) ("[P]enalties clearly signal that noncompliance is not acceptable behavior. . . .   In establishing social norms and expectations, subjecting the noncompliant behavior to any penalty may be as important as the exact level of the penalty . . . .").

58

deters the activities taxed"); *Sonzinsky v. United States*, 300 U.S. 506, 513 (1937) ("[A]n Act of Congress which on its face purports to be an exercise of the taxing power is not any the less so because the tax is burdensome or tends to restrict or suppress the thing taxed."); *cf., e.g.*, Affordable Health Care for America Act, H.R. 3962, 111th Cong. § 501 (2009) (House-passed bill on health care reform imposing a "[t]ax on individuals without acceptable health care coverage"); Patients' Choice Act, H.R. 2520, 111th Cong. §§ 301-303 (2009) (proposing to amend the Tax Code to create a refundable tax credit for the purchase of qualifying health insurance plans).[42]

*Second*, but far more broadly, by 2015 Congress might choose to eliminate Section 5000A altogether – that is, eliminate this financial disincentive for failing to have health insurance. Or the President might not enforce the individual mandate provision if the President concludes that enforcing it would be unconstitutional.[43] In one of those events, the

---

[42] To the extent eliminating the legal mandate language would decrease the incentive to buy health insurance, the amount of the exaction for not having health insurance could be increased (so long as it remains a civil exaction) if that were deemed appropriate to maintain an equivalent incentive.

[43] Under the Constitution, the President may decline to enforce a statute that regulates private individuals when the President deems the statute unconstitutional, even if a court has held or would hold the statute constitutional. *See Freytag v. Commissioner*, 501 U.S. 868, 906 (1991) (Scalia, J., concurring) (the President possesses "the power to veto encroaching laws or even to disregard them when they are unconstitutional") (citation omitted). Similarly, Congress may repeal or decline to pass a statute based on its own constitutional interpretation even if the courts have (or would have) upheld the statute as constitutional.

This power does not work in reverse, either for the President or Congress. In other words, the President may not enforce a

courts would likewise never have to opine on the constitutional issues presented in this case.

We all recognize the legislative realities that make any change unlikely, whether just to "fix" any potential constitutional problem or to take more significant action with respect to Section 5000A. After all, our constitutional system requires action by three entities before any legislative change may be approved – House, Senate, and Executive. Therefore, it is much harder to pass legislation – even technical fixes – than to block legislation. That said, there is the possibility of such legislative action that could obviate the need for the Judiciary to decide this immensely consequential constitutional issue.

To be clear, federal courts do not wait to decide constitutional cases simply because of the possibility of congressional change to the legislation or presidential non-enforcement of what the President concludes is an unconstitutional law. Delay on that basis would constitute judicial abdication, not judicial restraint. But the discussion here has been addressing the question whether there are compelling prudential considerations that would justify overriding the limits of the Anti-Injunction Act and deciding this case now. In considering that specific question, it is relevant to note that waiting to decide might mean *never*

---

statute against a private individual when the statute is deemed unconstitutional by the courts. Nor may Congress pass a statute and have it enforced against private individuals simply because Congress disagrees with the Supreme Court. In those situations, the Judiciary has the final word on the meaning of the Constitution. *See, e.g.*, *Boumediene v. Bush*, 553 U.S. 723 (2008); *Dickerson v. United States*, 530 U.S. 428 (2000); *United States v. Eichman*, 496 U.S. 310 (1990).

having to decide, a prospect that supports adherence to the Anti-Injunction Act.

## D

There is an additional compelling reason to be wary of an unnecessary or premature constitutional ruling in this case. As I have said, the Government's Taxing Clause argument may have a potential problem because of the statute's legal mandate (although that potential problem is relatively minor and could be easily fixed by Congress, as described above). Indeed, no court to reach the merits has accepted the Government's Taxing Clause argument. As a result, those courts have had to tackle the Government's Commerce Clause submission.

But the Commerce Clause issue is extremely difficult and rife with significant and potentially unforeseen implications for the Nation and the Judiciary. *Cf. Northwest Austin Municipal Utility District Number One*, 129 S. Ct. at 2513.[44]

To uphold the Affordable Care Act's mandatory-purchase requirement under the Commerce Clause, we would have to uphold a law that is unprecedented on the federal level in American history. That fact alone counsels the Judiciary to exercise great caution. *See United States v. Lopez*, 514 U.S. 549, 580, 583 (1995) (Kennedy, J., concurring) ("The statute before us upsets the federal balance to a degree that renders it an unconstitutional assertion of the commerce power, and our intervention is required. . . . If Congress attempts that extension, then at the least we must

---

[44] For purposes of this discussion, when referring to the Government's Commerce Clause argument, I am referring to both the Commerce Clause and the supplementary Necessary and Proper Clause.

inquire whether the exercise of national power seeks to intrude upon an area of traditional state concern. . . . The statute now before us forecloses the States from experimenting and exercising their own judgment in an area to which States lay claim by right of history and expertise, and it does so by regulating an activity beyond the realm of commerce in the ordinary and usual sense of that term."); *see also Printz v. United States*, 521 U.S. 898, 905 (1997) ("[I]f, as petitioners contend, earlier Congresses avoided use of this highly attractive power, we would have reason to believe that the power was thought not to exist.").

In addition, the Government's position on the Commerce Clause carries broad implications – far broader than its position on the Taxing Clause. Under the Government's Commerce Clause theory, as it freely acknowledged at oral argument, the Government could impose imprisonment or other criminal punishment on citizens who do not have health insurance. That is a rather jarring prospect. The Affordable Care Act does not impose such criminal penalties. But if we approve the Affordable Care Act's mandate under the Commerce Clause, we would necessarily be approving criminal punishment – including imprisonment – for failure to comply not only with this Act but also with future mandatory-purchase requirements.

Moreover, despite the Government's effort to cabin its Commerce Clause argument to mandatory purchases of health insurance, there seems no good reason its theory would not ultimately extend as well to mandatory purchases of retirement accounts, housing accounts, college savings accounts, disaster insurance, disability insurance, and life insurance, for example. We should hesitate to unnecessarily decide a case that could usher in a significant expansion of congressional authority with no obvious principled limit.

That is particularly so given that the government traditionally has achieved its objectives in these areas through Taxing Clause legislation that employs customary and permissible tax incentives and disincentives on certain behavior. *Cf. Lopez*, 514 U.S. at 580-83 (Kennedy, J., concurring).

Unlike some other courts that have upheld the mandate on Commerce Clause grounds and disclaimed the implications, the majority opinion here is quite candid – and accurate – in admitting that there is no real limiting principle to its Commerce Clause holding. The majority opinion's holding means, for example, that a law replacing Social Security with a system of *mandatory* private retirement accounts would be constitutional. So would a law *mandating* that parents purchase private college savings accounts. I credit the majority opinion for its refreshing candor. But its acknowledgement of the extraordinary ramifications of its decision expanding Congress's authority to impose mandatory-purchase requirements underscores why I think we should be cautious about barreling through jurisdictional limits to reach the merits, as the majority opinion does here.

To try to mitigate the dramatic implications of its no-limiting-principle holding, the majority opinion notes that Congress is subject to a political check. That's true, but as the Supreme Court has told us time and again, the structural principles of the Constitution are more than parchment barriers; they protect individual liberty. And the courts historically have played an important role in enforcing those structural principles and thereby safeguarding individual liberty. That Congress is subject to a political check does not absolve the Judiciary of its duty to safeguard the constitutional structure and individual liberty. *See Bond v. United States*, 131 S. Ct. 2355, 2364-65 (2011); *Free Enterprise Fund v. Public Co. Accounting Oversight Bd.*, 130

S. Ct. 3138, 3157 (2010); *Clinton v. City of New York*, 524 U.S. 417, 449-53 (1998) (Kennedy, J., concurring); *Lopez*, 514 U.S. at 575-80 (Kennedy, J., concurring); *INS v. Chadha*, 462 U.S. 919, 940-42, 944-59 (1983); *see also Morrison v. Olson*, 487 U.S. 654, 697-734 (1988) (Scalia, J., dissenting). Here, Congress's being subject to a political check thus does not do much to mitigate the fact that the majority opinion has green-lighted a significant expansion of congressional authority – and thus also a potentially significant infringement of individual liberty.

Having said all of that, we should be just as cautious about prematurely or unnecessarily *rejecting* the Government's Commerce Clause argument. The reason is plain and needs little elaboration: Striking down a federal law as beyond Congress's Commerce Clause authority is a rare, extraordinary, and momentous act for a federal court. *See Lopez*, 514 U.S. at 568, 568-75 (Kennedy, J., concurring) (exploring Commerce Clause history, which "counsels great restraint before the Court determines that the Clause is insufficient to support an exercise of the national power").

The elected Branches designed this law to help provide all Americans with access to affordable health insurance and quality health care, vital policy objectives. This legislation was enacted, moreover, after a high-profile and vigorous national debate. Courts must afford great respect to that legislative effort and should be wary of upending it.

This case also counsels restraint because we may be on the leading edge of a shift in how the Federal Government goes about furnishing a social safety net for those who are old, poor, sick, or disabled and need help. The theory of the individual mandate in this law is that private entities will do better than government in providing certain social insurance

and that mandates will work better than traditional regulatory taxes in prompting people to set aside money now to help pay for the assistance they might need later. Privatized social services combined with mandatory-purchase requirements of the kind employed in the individual mandate provision of the Affordable Care Act might become a blueprint used by the Federal Government over the next generation to partially privatize the social safety net and government assistance programs and move, at least to some degree, away from the tax-and-government-benefit model that is common now. Courts naturally should be very careful before interfering with the elected Branches' determination to update how the National Government provides such assistance. *Cf. Heart of Atlanta Motel, Inc. v. United States*, 379 U.S. 241 (1964); *NLRB v. Jones & Laughlin Steel Corp.*, 301 U.S. 1 (1937).

The significant implications of a Commerce Clause decision in this case – in either side's favor – lead to this point: If we need not decide the Commerce Clause issue now, we should not decide the Commerce Clause issue now. I therefore would not strain to sidestep the Anti-Injunction Act.

E

To be sure, courts may not shirk their duty to "say what the law is" in cases that are properly before them. *See Marbury v. Madison*, 5 U.S. 137, 177 (1803). As the Supreme Court has famously stated: "With whatever doubts, with whatever difficulties, a case may be attended, we must decide it, if it be brought before us. We have no more right to decline the exercise of jurisdiction which is given, than to usurp that which is not given." *Cohens v. Virginia*, 19 U.S. 264, 404 (1821).

And in fulfilling their duties, courts sometimes must decide difficult and far-reaching constitutional cases sooner

rather than later. *See, e.g.*, *Dames & Moore v. Regan*, 453 U.S. 654, 660 (1981); *United States v. Nixon*, 418 U.S. 683, 686-87 (1974); *Cooper v. Aaron*, 358 U.S. 1, 4-5 (1958); *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 584 (1952).

But history and precedent counsel caution before reaching out to decide difficult constitutional questions too quickly, especially when the underlying issues are of lasting significance. After all, what appears to be obviously correct now can look quite different just a few years down the road. *See W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624 (1943), *overruling Minersville School District v. Gobitis*, 310 U.S. 586 (1940); *NLRB v. Jones & Laughlin Steel Corp.*, 301 U.S. 1 (1937) (Hughes, C.J.), *backing away from A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495 (1935) (Hughes, C.J.).

Between now and 2015, Congress might keep the mandate as is and the President may enforce it as is. If that happens, the federal courts would resolve the resulting constitutional case by our best lights and would not shy away from a necessary constitutional decision. But history tells us to cross that bridge only if and when we need to. Unlike the majority opinion, I would adhere to the text of the Anti-Injunction Act and leave these momentous constitutional issues for another day – a day that may never come.

\* \* \*

I have the greatest respect for my two colleagues on this panel. But my analysis leads me decisively to the conclusion that we lack jurisdiction because of the Anti-Injunction Act. I therefore would vacate the judgment of the District Court and remand with directions that the suit be dismissed for lack of jurisdiction. I respectfully dissent.